# PRINTZ, SHERIFF/CORONER, RAVALLI COUNTY, MONTANA *v.* UNITED STATES

No. 95–1478. Argued December 3, 1996—Decided June 27, 1997*

---

*Together with No. 95–1503, *Mack* v. *United States,* also on certiorari to the same court.

900

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., post, p. 935, and THOMAS, J., post, p. 936, filed concurring opinions. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and

Breyer, JJ., joined, *post*, p. 939. Souter, J., filed a dissenting opinion, *post*, p. 970. Breyer, J., filed a dissenting opinion, in which Stevens, J., joined, *post*, p. 976.

*Stephen P. Halbrook* argued the cause for petitioners in both cases and filed briefs for petitioner in No. 95–1478. *David T. Hardy* filed briefs for petitioner in No. 95–1503.

*Acting Solicitor General Dellinger* argued the cause for the United States in both cases. With him on the brief were *Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Paul R. Q. Wolfson, Mark B. Stern,* and *Stephanie R. Marcus.*†

---

†Briefs of *amici curiae* urging reversal were filed for the State of Colorado et al. by *Gale A. Norton,* Attorney General of Colorado, *Stephen K. Erkenbrack,* Chief Deputy Attorney General, *Timothy M. Tymkovich,* Solicitor General, *Richard A. Westfall,* Special Deputy Solicitor General, *Paul Farley,* Deputy Attorney General, and *David B. Kopel,* and by the Attorneys General for their respective States as follows: *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Mark W. Barnett* of South Dakota, *James S. Gilmore* of Virginia, and *William U. Hill* of Wyoming; for the Gun Owners Foundation by *James H. Jeffries III* and *James H. Wentzel;* for the Law Enforcement Alliance of America by *James H. Warner;* for the Council of State Governments et al. by *D. Bruce La Pierre;* and for the National Rifle Association of America by *Robert Dowlut* and *Stefan B. Tahmassebi.*

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, David M. Silberman,* and *Laurence Gold;* for the Coalition to Stop Gun Violence et al. by *Donald B. Verrilli, Jr.;* for Handgun Control, Inc., et al. by *Eric J. Mogilnicki, James S. Campbell, Jeffrey P. Singdahlsen, Kathleen M. Miller,* and *Dennis A. Henigan;* and for Senator Herb Kohl et al. by *Andrew J. Pincus.*

Briefs of *amici curiae* were filed for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Andrew H. Baida* and *John B. Howard, Jr.,* Assistant Attorneys General, and *Richard Adams Cordray,* and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Margery S. Bronster* of Hawaii, *Thomas J. Miller* of Iowa, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Frankie Sue Del Papa* of Nevada, *Michael F. Easley* of North Carolina, *Theodore R. Kulongoski* of Oregon, *Jeffrey B. Pine* of

JUSTICE SCALIA delivered the opinion of the Court.

The question presented in these cases is whether certain interim provisions of the Brady Handgun Violence Prevention Act, Pub. L. 103–159, 107 Stat. 1536, commanding state and local law enforcement officers to conduct background checks on prospective handgun purchasers and to perform certain related tasks, violate the Constitution.

I

The Gun Control Act of 1968 (GCA), 18 U. S. C. § 921 *et seq.*, establishes a detailed federal scheme governing the distribution of firearms. It prohibits firearms dealers from transferring handguns to any person under 21, not resident in the dealer's State, or prohibited by state or local law from purchasing or possessing firearms, § 922(b). It also forbids possession of a firearm by, and transfer of a firearm to, convicted felons, fugitives from justice, unlawful users of controlled substances, persons adjudicated as mentally defective or committed to mental institutions, aliens unlawfully present in the United States, persons dishonorably discharged from the Armed Forces, persons who have renounced their citizenship, and persons who have been subjected to certain restraining orders or been convicted of a misdemeanor offense involving domestic violence. §§ 922(d) and (g).

In 1993, Congress amended the GCA by enacting the Brady Act. The Act requires the Attorney General to establish a national instant background-check system by November 30, 1998, Pub. L. 103–159, as amended, Pub. L. 103–322, 103 Stat. 2074, note following 18 U. S. C. § 922, and immediately puts in place certain interim provisions until that system becomes operative. Under the interim provisions, a firearms dealer who proposes to transfer a handgun

Rhode Island, and *James E. Doyle* of Wisconsin; for the Association of the Bar of the City of New York by *Michael A. Cardozo;* and for the Pacific Legal Foundation by *Sharon L. Browne.*

must first: (1) receive from the transferee a statement (the Brady Form), § 922(s)(1)(A)(i)(I), containing the name, address, and date of birth of the proposed transferee along with a sworn statement that the transferee is not among any of the classes of prohibited purchasers, § 922(s)(3); (2) verify the identity of the transferee by examining an identification document, § 922(s)(1)(A)(i)(II); and (3) provide the "chief law enforcement officer" (CLEO) of the transferee's residence with notice of the contents (and a copy) of the Brady Form, §§ 922(s)(1)(A)(i)(III) and (IV). With some exceptions, the dealer must then wait five business days before consummating the sale, unless the CLEO earlier notifies the dealer that he has no reason to believe the transfer would be illegal. § 922(s)(1)(A)(ii).

The Brady Act creates two significant alternatives to the foregoing scheme. A dealer may sell a handgun immediately if the purchaser possesses a state handgun permit issued after a background check, § 922(s)(1)(C), or if state law provides for an instant background check, § 922(s)(1)(D). In States that have not rendered one of these alternatives applicable to all gun purchasers, CLEOs are required to perform certain duties. When a CLEO receives the required notice of a proposed transfer from the firearms dealer, the CLEO must "make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General." § 922(s)(2). The Act does not require the CLEO to take any particular action if he determines that a pending transaction would be unlawful; he may notify the firearms dealer to that effect, but is not required to do so. If, however, the CLEO notifies a gun dealer that a prospective purchaser is ineligible to receive a handgun, he must, upon request, provide the would-be purchaser with a written statement of the reasons for that determination. § 922(s)(6)(C). Moreover, if the

CLEO does not discover any basis for objecting to the sale, he must destroy any records in his possession relating to the transfer, including his copy of the Brady Form. § 922(s)(6)(B)(i). Under a separate provision of the GCA, any person who "knowingly violates [the section of the GCA amended by the Brady Act] shall be fined under this title, imprisoned for not more than 1 year, or both." § 924(a)(5).

Petitioners Jay Printz and Richard Mack, the CLEOs for Ravalli County, Montana, and Graham County, Arizona, respectively, filed separate actions challenging the constitutionality of the Brady Act's interim provisions. In each case, the District Court held that the provision requiring CLEOs to perform background checks was unconstitutional, but concluded that that provision was severable from the remainder of the Act, effectively leaving a voluntary background-check system in place. 856 F. Supp. 1372 (Ariz. 1994); 854 F. Supp. 1503 (Mont. 1994). A divided panel of the Court of Appeals for the Ninth Circuit reversed, finding none of the Brady Act's interim provisions to be unconstitutional. 66 F. 3d 1025 (1995). We granted certiorari. 518 U. S. 1003 (1996).

## II

From the description set forth above, it is apparent that the Brady Act purports to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme. Regulated firearms dealers are required to forward Brady Forms not to a federal officer or employee, but to the CLEOs, whose obligation to accept those forms is implicit in the duty imposed upon them to make "reasonable efforts" within five days to determine whether the sales reflected in the forms are lawful. While the CLEOs are subjected to no federal requirement that they prevent the sales determined to be unlawful (it is perhaps assumed that their state-law duties will require prevention or apprehension), they are empowered to grant, in effect, waivers of the federally prescribed

5-day waiting period for handgun purchases by notifying the gun dealers that they have no reason to believe the transactions would be illegal.

Petitioners here object to being pressed into federal service, and contend that congressional action compelling state officers to execute federal laws is unconstitutional. Because there is no constitutional text speaking to this precise question, the answer to the CLEOs' challenge must be sought in historical understanding and practice, in the structure of the Constitution, and in the jurisprudence of this Court. We treat those three sources, in that order, in this and the next two sections of this opinion.

Petitioners contend that compelled enlistment of state executive officers for the administration of federal programs is, until very recent years at least, unprecedented. The Government contends, to the contrary, that "the earliest Congresses enacted statutes that required the participation of state officials in the implementation of federal laws," Brief for United States 28. The Government's contention demands our careful consideration, since early congressional enactments "provid[e] 'contemporaneous and weighty evidence' of the Constitution's meaning," *Bowsher* v. *Synar*, 478 U. S. 714, 723–724 (1986) (quoting *Marsh* v. *Chambers*, 463 U. S. 783, 790 (1983)). Indeed, such "contemporaneous legislative exposition of the Constitution . . . , acquiesced in for a long term of years, fixes the construction to be given its provisions." *Myers* v. *United States*, 272 U. S. 52, 175 (1926) (citing numerous cases). Conversely if, as petitioners contend, earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist.

The Government observes that statutes enacted by the first Congresses required state courts to record applications for citizenship, Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, to transmit abstracts of citizenship applications and other naturalization records to the Secretary of State, Act of June 18,

1798, ch. 54, § 2, 1 Stat. 567, and to register aliens seeking naturalization and issue certificates of registry, Act of Apr. 14, 1802, ch. 28, § 2, 2 Stat. 154–155. It may well be, however, that these requirements applied only in States that authorized their courts to conduct naturalization proceedings. See Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103; *Holmgren* v. *United States*, 217 U. S. 509, 516–517 (1910) (explaining that the Act of March 26, 1790, "conferred authority upon state courts to admit aliens to citizenship" and refraining from addressing the question "whether the States can be required to enforce such naturalization laws against their consent"); *United States* v. *Jones*, 109 U. S. 513, 519–520 (1883) (stating that these obligations were imposed "with the consent of the States" and "could not be enforced against the consent of the States").[1] Other statutes of that era apparently or at least arguably required state courts to perform functions unrelated to naturalization, such as resolving controversies between a captain and the crew of his ship concerning the seaworthiness of the vessel, Act of July 20, 1790, ch. 29, § 3, 1 Stat. 132, hearing the claims of slave owners who had apprehended fugitive slaves and issuing certificates authorizing the slave's forced removal to the State from which he had fled, Act of Feb. 12, 1793, ch. 7, § 3, 1 Stat. 302–305, taking

---

[1] The dissent is wrong in suggesting, *post*, at 950, n. 9, that the *Second Employers' Liability Cases, 223 U. S. 1 (1912), eliminate the possibility that the duties imposed on state courts and their clerks in connection with naturalization proceedings were contingent on the State's voluntary assumption of the task of adjudicating citizenship applications. The Second Employers' Liability Cases* stand for the proposition that a state court must entertain a claim arising under federal law "when its ordinary jurisdiction as prescribed by local laws is appropriate to the occasion and is invoked in conformity with those laws." *Id.*, at 56–57. This *does not necessarily conflict with Holmgren and Jones*, as the States obviously regulate the "ordinary jurisdiction" of their courts. (Our references throughout this opinion to "the dissent" are to the dissenting opinion of JUSTICE STEVENS, joined by JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER. The separate dissenting opinions of JUSTICE SOUTER and JUSTICE BREYER will be referred to as such.)

proof of the claims of Canadian refugees who had assisted the United States during the Revolutionary War, Act of Apr. 7, 1798, ch. 26, § 3, 1 Stat. 548, and ordering the deportation of alien enemies in times of war, Act of July 6, 1798, ch. 66, § 2, 1 Stat. 577–578.

These early laws establish, at most, that the Constitution was originally understood to permit imposition of an obligation on state *judges* to enforce federal prescriptions, insofar as those prescriptions related to matters appropriate for the judicial power.    That assumption was perhaps implicit in one of the provisions of the Constitution, and was explicit in another.    In accord with the so-called Madisonian Compromise, Article III, § 1, established only a Supreme Court, and made the creation of lower federal courts optional with the Congress—even though it was obvious that the Supreme Court alone could not hear all federal cases throughout the United States.    See C. Warren, The Making of the Constitution 325–327 (1928).    And the Supremacy Clause, Art. VI, cl. 2, announced that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby."    It is understandable why courts should have been viewed distinctively in this regard; unlike legislatures and executives, they applied the law of other sovereigns all the time.    The principle underlying so-called "transitory" causes of action was that laws which operated elsewhere created obligations in justice that courts of the forum State would enforce.    See, *e. g., McKenna* v. *Fisk*, 1 How. 241, 247–249 (1843).    The Constitution itself, in the Full Faith and Credit Clause, Art. IV, § 1, generally required such enforcement with respect to obligations arising in other States.    See *Hughes* v. *Fetter*, 341 U. S. 609 (1951).

For these reasons, we do not think the early statutes imposing obligations on state courts imply a power of Congress to impress the state executive into its service.    Indeed, it can be argued that the numerousness of these statutes, contrasted with the utter lack of statutes imposing obligations

on the States' executive (notwithstanding the attractiveness of that course to Congress), suggests an assumed *absence* of such power.[2] The only early federal law the Government has brought to our attention that imposed duties on state executive officers is the Extradition Act of 1793, which re-

---

[2] Bereft of even a single early, or indeed even pre-20th-century, statute compelling state executive officers to administer federal laws, the dissent is driven to claim that early federal statutes compelled state judges to perform executive functions, which implies a power to compel state executive officers to do so as well. Assuming that this implication would follow (which is doubtful), the premise of the argument is in any case wrong. None of the early statutes directed to state judges or court clerks required the performance of functions more appropriately characterized as executive than judicial (bearing in mind that the line between the two for present purposes is not necessarily identical with the line established by the Constitution for federal separation-of-powers purposes, see *Sweezy* v. *New Hampshire*, 354 U. S. 234, 255 (1957)). Given that state courts were entrusted with the quintessentially adjudicative task of determining whether applicants for citizenship met the requisite qualifications, see Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, it is unreasonable to maintain that the ancillary functions of recording, registering, and certifying the citizenship applications were unalterably executive rather than judicial in nature.

The dissent's assertion that the Act of July 20, 1790, ch. 29, § 3, 1 Stat. 132–133, which required state courts to resolve controversies between captain and crew regarding seaworthiness of a vessel, caused state courts to act "like contemporary regulatory agencies," *post*, at 950–951, is cleverly true—because contemporary regulatory agencies have been allowed to perform adjudicative ("quasi-judicial") functions. See 5 U. S. C. § 554; *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935). It is foolish, however, to mistake the copy for the original, and to believe that 18th-century courts were imitating agencies, rather than 20th-century agencies imitating courts. The Act's requirement that the court appoint "three persons in the neighbourhood ... most skilful in maritime affairs" to examine the ship and report on its condition certainly does not change the proceeding into one "supervised by a judge but otherwise more characteristic of executive activity," *post*, at 951; that requirement is not significantly different from the contemporary judicial practice of appointing expert witnesses, see, *e. g.*, Fed. Rule Evid. 706. The ultimate function of the judge under the Act was purely adjudicative; he was, after receiving the report, to "adjudge and determine ... whether the said ship or vessel is fit to proceed on the intended voyage ...." 1 Stat. 132.

quired the "executive authority" of a State to cause the arrest and delivery of a fugitive from justice upon the request of the executive authority of the State from which the fugitive had fled. See Act of Feb. 12, 1793, ch. 7, § 1, 1 Stat. 302. That was in direct implementation, however, of the Extradition Clause of the Constitution itself, see Art. IV, § 2.[3]

Not only do the enactments of the early Congresses, as far as we are aware, contain no evidence of an assumption that the Federal Government may command the States' executive power in the absence of a particularized constitutional authorization, they contain some indication of precisely the opposite assumption. On September 23, 1789—the day before its proposal of the Bill of Rights, see 1 Annals of Congress 912–913—the First Congress enacted a law aimed at obtaining state assistance of the most rudimentary and necessary sort for the enforcement of the new Government's laws: the holding of federal prisoners in state jails at federal expense. Significantly, the law issued not a command to the States' executive, but a recommendation to their legislatures. Congress "recommended to the legislatures of the several States to pass laws, making it expressly the duty of the keepers of their gaols, to receive and safe keep therein all prisoners committed under the authority of the United States," and offered to pay 50 cents per month for each prisoner. Act of Sept. 23, 1789, 1 Stat. 96. Moreover, when Georgia refused

---

[3] Article IV, § 2, cl. 2, provides:

"A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

To the extent the legislation went beyond the substantive requirement of this provision and specified procedures to be followed in complying with the constitutional obligation, we have found that that was an exercise of the congressional power to "prescribe the Manner in which such Acts, Records and Proceedings, shall be proved, and the Effect thereof," Art. IV, § 1. See *California* v. *Superior Court of Cal., San Bernardino Cty.*, 482 U. S. 400, 407 (1987).

to comply with the request, see L. White, The Federalists 402 (1948), Congress's only reaction was a law authorizing the marshal in any State that failed to comply with the Recommendation of September 23, 1789, to rent a temporary jail until provision for a permanent one could be made, see Resolution of Mar. 3, 1791, 1 Stat. 225.

In addition to early legislation, the Government also appeals to other sources we have usually regarded as indicative of the original understanding of the Constitution. It points to portions of The Federalist which reply to criticisms that Congress's power to tax will produce two sets of revenue officers—for example, "Brutus's" assertion in his letter to the New York Journal of December 13, 1787, that the Constitution "opens a door to the appointment of a swarm of revenue and excise officers to prey upon the honest and industrious part of the community, eat up their substance, and riot on the spoils of the country," reprinted in 1 Debate on the Constitution 502 (B. Bailyn ed. 1993). "Publius" responded that Congress will probably "make use of the State officers and State regulations, for collecting" federal taxes, The Federalist No. 36, p. 221 (C. Rossiter ed. 1961) (A. Hamilton) (hereinafter The Federalist), and predicted that "the eventual collection [of internal revenue] under the immediate authority of the Union, will generally be made by the officers, and according to the rules, appointed by the several States," id., No. 45, at 292 (J. Madison). The Government also invokes The Federalist's more general observations that the Constitution would "enable the [national] government to employ the ordinary magistracy of each [State] in the execution of its laws," id., No. 27, at 176 (A. Hamilton), and that it was "extremely probable that in other instances, particularly in the organization of the judicial power, the officers of the States will be clothed with the correspondent authority of the Union," id., No. 45, at 292 (J. Madison). But none of these statements necessarily implies—what is the critical point here—that Congress could impose these responsibil-

ities *without the consent of the States.* They appear to rest on the natural assumption that the States would consent to allowing their officials to assist the Federal Government, see *FERC* v. *Mississippi,* 456 U. S. 742, 796, n. 35 (1982) (O'CONNOR, J., concurring in judgment in part and dissenting in part), an assumption proved correct by the extensive mutual assistance the States and Federal Government voluntarily provided one another in the early days of the Republic, see generally White, *supra,* at 401–404, including voluntary *federal implementation of state law,* see, *e. g.,* Act of Apr. 2, 1790, ch. 5, § 1, 1 Stat. 106 (directing federal tax collectors and customs officers to assist in enforcing state inspection laws).

Another passage of The Federalist reads as follows:

> "It merits particular attention . . . that the laws of the Confederacy as to the *enumerated* and *legitimate* objects of its jurisdiction will become the SUPREME LAW of the land; to the observance of which all officers, legislative, executive, and judicial in each State will be bound by the sanctity of an oath. Thus, the legislatures, courts, and magistrates, of the respective members will be incorporated into the operations of the national government *as far as its just and constitutional authority extends;* and will be rendered auxiliary to the enforcement of its laws." The Federalist No. 27, at 177 (A. Hamilton) (emphasis in original).

The Government does not rely upon this passage, but JUSTICE SOUTER (with whose conclusions on this point the dissent is in agreement, see *post,* at 947–948) makes it the very foundation of his position; so we pause to examine it in some detail. JUSTICE SOUTER finds "[t]he natural reading" of the phrases "'will be incorporated into the operations of the national government'" and "'will be rendered auxiliary to the enforcement of its laws'" to be that the National Government will have "authority . . . , when exercising an other-

wise legitimate power (the commerce power, say), to require state 'auxiliaries' to take appropriate action." *Post,* at 971, 975. There are several obstacles to such an interpretation. First, the consequences in question ("incorporated into the operations of the national government" and "rendered auxiliary to the enforcement of its laws") are said in the quoted passage to flow *automatically* from the officers' oath to observe "the laws of the Confederacy as to the *enumerated* and *legitimate* objects of its jurisdiction."[4] Thus, if the passage means that state officers must take an active role in the implementation of federal law, it means that they must do so without the necessity for a congressional directive that they implement it. But no one has ever thought, and no one asserts in the present litigation, that that is the law. The second problem with JUSTICE SOUTER's reading is that it makes state *legislatures* subject to federal direction. (The passage in question, after all, does not include legislatures merely incidentally, as by referring to "all state officers"; it refers to legislatures *specifically* and *first of all.*) We have held, however, that state legislatures are *not* subject to federal direction. *New York* v. *United States,* 505 U. S. 144 (1992).[5]

---

[4] Both the dissent and JUSTICE SOUTER dispute that the consequences are said to flow automatically. They are wrong. The passage says that (1) federal laws will be supreme, and (2) all state officers will be oathbound to observe those laws, and *thus* (3) state officers will be "incorporated" and "rendered auxiliary." The reason the progression is automatic is that there is *not* included between (2) and (3): "(2a) those laws will include laws compelling action by state officers." It is the mere existence of *all* federal laws that is said to make state officers "incorporated" and "auxiliary."

[5] JUSTICE SOUTER seeks to avoid incompatibility with *New York* (a decision which he joined and purports to adhere to), by saying, *post,* at 975, that the passage does not mean "any conceivable requirement may be imposed on any state official," and that "the essence of legislative power . . . is a discretion not subject to command," so that legislatures, at least, cannot be commanded. But then why were legislatures mentioned in the passage? It seems to us assuredly *not* a "natural reading" that being "rendered auxiliary to the enforcement of [the National Government's]

These problems are avoided, of course, if the calculatedly vague consequences the passage recites—"incorporated into the operations of the national government" and "rendered auxiliary to the enforcement of its laws"—are taken to refer to nothing more (or less) than the duty owed to the National Government, on the part of *all* state officials, to enact, enforce, and interpret state law in such fashion as not to obstruct the operation of federal law, and the attendant reality that all state actions constituting such obstruction, even legislative Acts, are *ipso facto* invalid.[6] See *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984) (federal pre-emption of conflicting state law). This meaning accords well with the context of the passage, which seeks to explain why the new system of federal law directed to individual citizens, unlike the old one of federal law directed to the States, will "bid much fairer to avoid the necessity of using force" against the States, The Federalist No. 27, at 176. It also reconciles the

laws" means impressibility into federal service for "courts and magistrates" but something quite different for "legislatures." Moreover, the novel principle of political science that JUSTICE SOUTER invokes in order to bring forth disparity of outcome from parity of language—namely, that "the essence of legislative power . . . is a discretion not subject to command," *ibid.*—seems to us untrue. Perhaps legislatures are inherently uncommandable as to the outcome of their legislation, but they are commanded all the time as to what subjects they shall legislate upon—commanded, that is, by the people, in constitutional provisions that require, for example, the enactment of annual budgets or forbid the enactment of laws permitting gambling. We do not think that state legislatures would be betraying their very "essence" as legislatures (as opposed to their nature as sovereigns, a nature they share with the other two branches of Government) if they obeyed a federal command to enact laws, for example, criminalizing the sale of marijuana.

[6] If JUSTICE SOUTER finds these obligations too insignificant, see *post*, at 972–973, n. 1, then perhaps he should subscribe to the interpretations of "essential agency" given by Madison, see *infra*, at 914–915, and n. 8, or by Story, see n. 8, *infra*. The point is that there is *no* necessity to give the phrase the problematic meaning which alone enables him to use it as a basis for deciding this case.

passage with Hamilton's statement in The Federalist No. 36, at 222, that the Federal Government would in some circumstances do well "to employ the State officers as much as possible, and to attach them to the Union by an accumulation of their emoluments"—which surely suggests inducing state officers to come aboard by paying them, rather than merely commandeering their official services.[7]

JUSTICE SOUTER contends that his interpretation of The Federalist No. 27 is "supported by No. 44," written by Madison, wherefore he claims that "Madison and Hamilton" together stand opposed to our view. *Post,* at 971, 975. In fact, The Federalist No. 44 quite clearly contradicts JUSTICE SOUTER's reading. In that Number, Madison justifies the requirement that state officials take an oath to support the Federal Constitution on the ground that they "will have an essential agency in giving effect to the federal Constitution." If the dissent's reading of The Federalist No. 27 were correct (and if Madison agreed with it), one would surely have expected that "essential agency" of state executive officers (if described further) to be described as their responsibility to execute the laws enacted under the Constitution. Instead, however, The Federalist No. 44 continues with the following description:

> "The election of the President and Senate will depend, in all cases, on the legislatures of the several States. And the election of the House of Representatives will equally depend on the same authority in the first instance; and will, probably, forever *be conducted by the officers* and according to the laws *of the States." Id.,* at 287 (emphasis added).

---

[7] JUSTICE SOUTER deduces from this passage in No. 36 that although the Federal Government *may* commandeer state officers, it *must* compensate them for their services. This is a mighty leap, which would create a constitutional jurisprudence (for determining when the compensation was adequate) that would make takings cases appear clear and simple.

It is most implausible that the person who labored for that example of state executive officers' assisting the Federal Government believed, but neglected to mention, that they had a responsibility to execute federal laws.[8]  If it was indeed Hamilton's view that the Federal Government could direct the officers of the States, that view has no clear support in Madison's writings, or as far as we are aware, in text, history, or early commentary elsewhere.[9]

---

[8] JUSTICE SOUTER's discussion of this passage omits to mention that it *contains an example* of state executives' "essential agency"—and indeed implies the opposite by observing that "*other* numbers of The *Federalist* give examples" of the "essential agency" of state executive officers.  *Post,* at 973 (emphasis added).  In seeking to explain the curiousness of Madison's *not mentioning* the state executives' obligation to administer federal law, JUSTICE SOUTER says that in speaking of "an essential agency in giving effect to the federal Constitution," The Federalist No. 44, Madison "was not talking about executing congressional statutes; he was talking about putting the National Constitution into effect," *post,* at 973, n. 2. Quite so, which is our very point.

It is interesting to observe that Story's Commentaries on the Constitution, commenting upon the same issue of why state officials are required by oath to support the Constitution, uses the same "essential agency" language as Madison did in The Federalist No. 44, and goes on to give more numerous examples of state executive agency than Madison did; all of them, however, involve not state administration of federal law, but merely the implementation of duties imposed on state officers by the Constitution itself: "The executive authority of the several states may be often called upon to exert Powers or allow Rights given by the Constitution, as in filling vacancies in the senate during the recess of the legislature; in issuing writs of election to fill vacancies in the house of representatives; in officering the militia, and giving effect to laws for calling them; and in the surrender of fugitives from justice." 2 Story, Commentaries on the Constitution of the United States 577 (1851).

[9] Even if we agreed with JUSTICE SOUTER's reading of The Federalist No. 27, it would still seem to us most peculiar to give the view expressed in that one piece, not clearly confirmed by any other writer, the determinative weight he does.  That would be crediting the most expansive view of federal authority ever expressed, and from the pen of the most expansive expositor of federal power.  Hamilton was "from first to last the most nationalistic of all nationalists in his interpretation of the clauses of our

To complete the historical record, we must note that there is not only an absence of executive-commandeering statutes in the early Congresses, but there is an absence of them in our later history as well, at least until very recent years. The Government points to the Act of August 3, 1882, ch. 376, §§ 2, 4, 22 Stat. 214, which enlisted state officials "to take charge of the local affairs of immigration in the ports within such State, and to provide for the support and relief of such immigrants therein landing as may fall into distress or need of public aid"; to inspect arriving immigrants and exclude any person found to be a "convict, lunatic, idiot," or indigent; and to send convicts back to their country of origin "without compensation." The statute did not, however, *mandate* those duties, but merely empowered the Secretary of the Treasury "to *enter into contracts* with such State . . . officers as *may be designated* for that purpose *by the governor* of any State." (Emphasis added.)

The Government cites the World War I selective draft law that authorized the President "to utilize the service of any or all departments and any or all officers or agents of the United States *and of the several States*, Territories, and the District of Columbia, and subdivisions thereof, in the execution of this Act," and made any person who refused to comply

---

federal Constitution." C. Rossiter, Alexander Hamilton and the Constitution 199 (1964). More specifically, it is widely recognized that "The Federalist reads with a split personality" on matters of federalism. See D. Braveman, W. Banks, & R. Smolla, Constitutional Law: Structure and Rights in Our Federal System 198–199 (3d ed. 1996). While overall The Federalist reflects a "large area of agreement between Hamilton and Madison," Rossiter, *supra*, at 58, that is not the case with respect to the subject at hand, see Braveman, *supra*, at 198–199. To choose Hamilton's view, as JUSTICE SOUTER would, is to turn a blind eye to the fact that it was Madison's—not Hamilton's—that prevailed, not only at the Constitutional Convention and in popular sentiment, see Rossiter, *supra*, at 44–47, 194, 196; 1 Records of the Federal Convention 366 (M. Farrand ed. 1911), but in the subsequent struggle to fix the meaning of the Constitution by early congressional practice, see *supra*, at 905–910.

with the President's directions guilty of a misdemeanor. Act of May 18, 1917, ch. 15, §6, 40 Stat. 80–81 (emphasis added). However, it is far from clear that the authorization "to utilize the service" of state officers was an authorization to *compel* the service of state officers; and the misdemeanor provision surely applied only to refusal to comply with the President's *authorized* directions, which might not have included directions to officers of States whose Governors had not volunteered their services. It is interesting that in implementing the Act President Wilson did not commandeer the services of state officers, but instead requested the assistance of the States' Governors, see Proclamation of May 18, 1917, 40 Stat. 1665 ("call[ing] upon the Governor of each of the several States . . . and all officers and agents of the several States . . . to perform certain duties"); Registration Regulations Prescribed by the President Under the Act of Congress Approved May 18, 1917, pt. 1, §7 ("[T]he governor [of each State] is *requested* to act under the regulations and rules prescribed by the President or under his direction" (emphasis added)), obtained the consent of each of the Governors, see Note, The President, the Senate, the Constitution, and the Executive Order of May 8, 1926, 21 Ill. L. Rev. 142, 144 (1926), and left it to the Governors to issue orders to their subordinate state officers, see Selective Service Regulations Prescribed by the President Under the Act of May 18, 1917, §27 (1918); J. Clark, The Rise of a New Federalism 91 (1965). See generally Note, 21 Ill. L. Rev., at 144. It is impressive that even with respect to a wartime measure the President should have been so solicitous of state independence.

The Government points to a number of federal statutes enacted within the past few decades that require the participation of state or local officials in implementing federal regulatory schemes. Some of these are connected to federal funding measures, and can perhaps be more accurately described as conditions upon the grant of federal funding than

as mandates to the States; others, which require only the provision of information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program. We of course do not address these or other currently operative enactments that are not before us; it will be time enough to do so if and when their validity is challenged in a proper case. For deciding the issue before us here, they are of little relevance. Even assuming they represent assertion of the very same congressional power challenged here, they are of such recent vintage that they are no more probative than the statute before us of a constitutional tradition that lends meaning to the text. Their persuasive force is far outweighed by almost two centuries of apparent congressional avoidance of the practice. Compare *INS* v. *Chadha*, 462 U. S. 919 (1983), in which the legislative veto, though enshrined in perhaps hundreds of federal statutes, most of which were enacted in the 1970's and the earliest of which was enacted in 1932, see *id.*, at 967–975 (White, J., dissenting), was nonetheless held unconstitutional.

## III

The constitutional practice we have examined above tends to negate the existence of the congressional power asserted here, but is not conclusive. We turn next to consideration of the structure of the Constitution, to see if we can discern among its "essential postulate[s]," *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 322 (1934), a principle that controls the present cases.

## A

It is incontestible that the Constitution established a system of "dual sovereignty." *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991); *Tafflin* v. *Levitt*, 493 U. S. 455, 458 (1990). Although the States surrendered many of their powers to

the new Federal Government, they retained "a residuary and inviolable sovereignty," The Federalist No. 39, at 245 (J. Madison). This is reflected throughout the Constitution's text, *Lane County* v. *Oregon,* 7 Wall. 71, 76 (1869); *Texas* v. *White,* 7 Wall. 700, 725 (1869), including (to mention only a few examples) the prohibition on any involuntary reduction or combination of a State's territory, Art. IV, § 3; the Judicial Power Clause, Art. III, § 2, and the Privileges and Immunities Clause, Art. IV, § 2, which speak of the "Citizens" of the States; the amendment provision, Article V, which requires the votes of three-fourths of the States to amend the Constitution; and the Guarantee Clause, Art. IV, § 4, which "presupposes the continued existence of the states and . . . those means and instrumentalities which are the creation of their sovereign and reserved rights," *Helvering* v. *Gerhardt,* 304 U. S. 405, 414–415 (1938). Residual state sovereignty was also implicit, of course, in the Constitution's conferral upon Congress of not all governmental powers, but only discrete, enumerated ones, Art. I, § 8, which implication was rendered express by the Tenth Amendment's assertion that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The Framers' experience under the Articles of Confederation had persuaded them that using the States as the instruments of federal governance was both ineffectual and provocative of federal-state conflict. See The Federalist No. 15. Preservation of the States as independent political entities being the price of union, and "[t]he practicality of making laws, with coercive sanctions, for the States as political bodies" having been, in Madison's words, "exploded on all hands," 2 Records of the Federal Convention of 1787, p. 9 (M. Farrand ed. 1911), the Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and

920

Federal Governments would exercise concurrent authority over the people—who were, in Hamilton's words, "the only proper objects of government," The Federalist No. 15, at 109. We have set forth the historical record in more detail elsewhere, see *New York* v. *United States,* 505 U. S., at 161–166, and need not repeat it here. It suffices to repeat the conclusion: "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *Id.,* at 166.[10] The great innovation of this design was that "our citizens would have two political capacities, one state and one federal, each protected from incursion by the other"—"a legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779, 838 (1995) (KENNEDY, J., concurring). The Constitution thus contemplates that a State's government will represent and remain accountable to its own citizens. See *New York, supra,* at 168–169; *United States* v. *Lopez,* 514 U. S. 549, 576–577 (1995) (KENNEDY, J., concurring). Cf. *Edgar* v. *MITE Corp.,* 457 U. S. 624, 644 (1982) ("[T]he State has no legitimate interest in protecting nonresident[s]"). As Madison expressed it: "[T]he local or municipal authorities form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general au-

---

[10] The dissent, reiterating JUSTICE STEVENS's dissent in *New York,* 505 U. S., at 210–213, maintains that the Constitution merely *augmented* the pre-existing power under the Articles to issue commands to the States with the additional power to make demands directly on individuals. See *post,* at 945. That argument, however, was squarely rejected by the Court in *New York, supra,* at 161–166, and with good reason. Many of Congress's powers under Art. I, §8, were copied almost verbatim from the Articles of Confederation, indicating quite clearly that "[w]here the Constitution intends that our Congress enjoy a power once vested in the Continental Congress, it specifically grants it." Prakash, Field Office Federalism, 79 Va. L. Rev. 1957, 1972 (1993).

thority than the general authority is subject to them, within its own sphere." The Federalist No. 39, at 245.[11]

This separation of the two spheres is one of the Constitution's structural protections of liberty. "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U. S., at 458. To quote Madison once again:

---

[11] JUSTICE BREYER's dissent would have us consider the benefits that other countries, and the European Union, believe they have derived from federal systems that are different from ours. We think such comparative analysis inappropriate to the task of interpreting a constitution, though it was of course quite relevant to the task of writing one. The Framers were familiar with many federal systems, from classical antiquity down to their own time; they are discussed in Nos. 18–20 of The Federalist. Some were (for the purpose here under discussion) quite similar to the modern "federal" systems that JUSTICE BREYER favors. Madison's and Hamilton's opinion of such systems could not be clearer. The Federalist No. 20, after an extended critique of the system of government established by the Union of Utrecht for the United Netherlands, concludes:

"I make no apology for having dwelt so long on the contemplation of these federal precedents. Experience is the oracle of truth; and where its responses are unequivocal, they ought to be conclusive and sacred. The important truth, which it unequivocally pronounces in the present case, is that a sovereignty over sovereigns, a government over governments, a legislation for communities, as contradistinguished from individuals, as it is a solecism in theory, so in practice it is subversive of the order and ends of civil polity . . . ." *Id.*, at 138.

Antifederalists, on the other hand, pointed specifically to Switzerland— and its then-400 years of success as a "confederate republic"—as proof that the proposed Constitution and its federal structure was unnecessary. See Patrick Henry, Speeches given before the Virginia Ratifying Convention, 4 and 5 June, 1788, reprinted in The Essential Antifederalist 123, 135–136 (W. Allen & G. Lloyd ed. 1985). The fact is that our federalism is not Europe's. It is "the unique contribution of the Framers to political science and political theory." *United States* v. *Lopez*, 514 U. S. 549, 575 (1995) (KENNEDY, J., concurring) (citing Friendly, Federalism: A Forward, 86 Yale L. J. 1019 (1977)).

"In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself." The Federalist No. 51, at 323.

See also The Federalist No. 28, at 180–181 (A. Hamilton). The power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States.

B

We have thus far discussed the effect that federal control of state officers would have upon the first element of the "double security" alluded to by Madison: the division of power between State and Federal Governments. It would also have an effect upon the second element: the separation and equilibration of powers between the three branches of the Federal Government itself. The Constitution does not leave to speculation who is to administer the laws enacted by Congress; the President, it says, "shall take Care that the Laws be faithfully executed," Art. II, § 3, personally and through officers whom he appoints (save for such inferior officers as Congress may authorize to be appointed by the "Courts of Law" or by "the Heads of Departments" who are themselves Presidential appointees), Art. II, § 2. The Brady Act effectively transfers this responsibility to thousands of CLEOs in the 50 States, who are left to implement the program without meaningful Presidential control (if indeed meaningful Presidential control is possible without the power to appoint and remove). The insistence of the Framers upon unity in the Federal Executive—to ensure both vigor and accountability—is well known. See The Federalist No. 70 (A. Hamilton); 2 Documentary History of the Rati-

fication of the Constitution 495 (M. Jensen ed. 1976) (statement of James Wilson); see also Calabresi & Prakash, The President's Power to Execute the Laws, 104 Yale L. J. 541 (1994). That unity would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its laws.[12]

## C

The dissent of course resorts to the last, best hope of those who defend ultra vires congressional action, the Necessary and Proper Clause. It reasons, *post*, at 941, that the power to regulate the sale of handguns under the Commerce Clause, coupled with the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers," Art. I, §8, conclusively establishes the Brady Act's constitutional validity, because the Tenth Amendment imposes no limitations on the exercise of *delegated* powers but merely prohibits the exercise of powers "*not* delegated to the United States." What destroys the dissent's Necessary and Proper Clause argument, however, is not the Tenth Amendment but the Necessary and Proper Clause itself.[13] When a "La[w] . . . for carrying into Execu-

---

[12] There is not, as the dissent believes, *post*, at 960, "tension" between the proposition that impressing state police officers into federal service will massively augment *federal* power, and the proposition that it will also sap the power of the Federal *Presidency*. It is quite possible to have a more powerful Federal Government that is, by reason of the destruction of its Executive unity, a less efficient one. The dissent is correct, *post*, at 959–960, that control by the unitary Federal Executive is also sacrificed when States voluntarily administer federal programs, but the condition of voluntary state participation significantly reduces the ability of Congress to use this device as a means of reducing the power of the Presidency.

[13] This argument also falsely presumes that the Tenth Amendment is the exclusive textual source of protection for principles of federalism. Our system of dual sovereignty is reflected in numerous constitutional provisions, see *supra*, at 919, and not only those, like the Tenth Amendment, that speak to the point explicitly. It is not at all unusual for our

tion" the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional provisions we mentioned earlier, *supra*, at 919, it is not a "La[w] . . . *proper* for carrying into Execution the Commerce Clause," and is thus, in the words of The Federalist, "merely [an] ac[t] of usurpation" which "deserve[s] to be treated as such." The Federalist No. 33, at 204 (A. Hamilton). See Lawson & Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L. J. 267, 297–326, 330–333 (1993). We in fact answered the dissent's Necessary and Proper Clause argument in *New York:* "[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. . . . [T]he Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." 505 U. S., at 166.

The dissent perceives a simple answer in that portion of Article VI which requires that "all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution," arguing that by virtue of the Supremacy Clause this makes "not only the Constitution, but every law enacted by Congress as well," binding on state officers, including laws requiring state-officer enforcement. *Post*, at 944. The Supremacy Clause, however, makes "Law of the Land" only "Laws of the United States which shall be made in Pursuance [of the Constitution]," Art. VI, cl. 2, so the Supremacy

---

resolution of a significant constitutional question to rest upon reasonable implications. See, *e. g., Myers* v. *United States,* 272 U. S. 52 (1926) (finding by implication from Art. II, §§ 1, 2, that the President has the exclusive power to remove executive officers); *Plaut* v. *Spendthrift Farm, Inc.,* 514 U. S. 211 (1995) (finding that Article III implies a lack of congressional power to set aside final judgments).

Clause merely brings us back to the question discussed earlier, whether laws conscripting state officers violate state sovereignty and are thus not in accord with the Constitution.

## IV

Finally, and most conclusively in the present litigation, we turn to the prior jurisprudence of this Court. Federal commandeering of state governments is such a novel phenomenon that this Court's first experience with it did not occur until the 1970's, when the Environmental Protection Agency promulgated regulations requiring States to prescribe auto emissions testing, monitoring and retrofit programs, and to designate preferential bus and carpool lanes. The Courts of Appeals for the Fourth and Ninth Circuits invalidated the regulations on statutory grounds in order to avoid what they perceived to be grave constitutional issues, see *Maryland* v. *EPA*, 530 F. 2d 215, 226 (CA4 1975); *Brown* v. *EPA*, 521 F. 2d 827, 838–842 (CA9 1975); and the District of Columbia Circuit invalidated the regulations on both constitutional and statutory grounds, see *District of Columbia* v. *Train*, 521 F. 2d 971, 994 (1975). After we granted certiorari to review the statutory and constitutional validity of the regulations, the Government declined even to defend them, and instead rescinded some and conceded the invalidity of those that remained, leading us to vacate the opinions below and remand for consideration of mootness. *EPA* v. *Brown*, 431 U. S. 99 (1977) *(per curiam)*.

Although we had no occasion to pass upon the subject in *Brown*, later opinions of ours have made clear that the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs. In *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981), and *FERC* v. *Mississippi*, 456 U. S. 742 (1982), we sustained statutes against constitutional challenge only after assuring ourselves that they did not require the States to enforce federal law. In

*Hodel* we cited the lower court cases in *EPA* v. *Brown*, *supra*, but concluded that the Surface Mining Control and Reclamation Act of 1977 did not present the problem they raised because it merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field, *Hodel, supra*, at 288. In *FERC*, we construed the most troubling provisions of the Public Utility Regulatory Policies Act of 1978 to contain only the "command" that state agencies "consider" federal standards, and again only as a precondition to continued state regulation of an otherwise pre-empted field. 456 U. S., at 764–765. We warned that "this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations," *id.*, at 761–762.

When we were at last confronted squarely with a federal statute that unambiguously required the States to enact or administer a federal regulatory program, our decision should have come as no surprise. At issue in *New York* v. *United States*, 505 U. S. 144 (1992), were the so-called "take title" provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985, which required States either to enact legislation providing for the disposal of radioactive waste generated within their borders, or to take title to, and possession of, the waste—effectively requiring the States either to legislate pursuant to Congress's directions, or to implement an administrative solution. *Id.*, at 175–176. We concluded that Congress could constitutionally require the States to do neither. *Id.*, at 176. "The Federal Government," we held, "may not compel the States to enact or administer a federal regulatory program." *Id.*, at 188.

The Government contends that *New York* is distinguishable on the following ground: Unlike the "take title" provisions invalidated there, the background-check provision of the Brady Act does not require state legislative or executive officials to make policy, but instead issues a final directive to state CLEOs. It is permissible, the Government asserts,

for Congress to command state or local officials to assist in the implementation of federal law so long as "Congress itself devises a clear legislative solution that regulates private conduct" and requires state or local officers to provide only "limited, non-policymaking help in enforcing that law." "[T]he constitutional line is crossed only when Congress compels the States to make law in their sovereign capacities." Brief for United States 16.

The Government's distinction between "making" law and merely "enforcing" it, between "policymaking" and mere "implementation," is an interesting one. It is perhaps not meant to be the same as, but it is surely reminiscent of, the line that separates proper congressional conferral of Executive power from unconstitutional delegation of legislative authority for federal separation-of-powers purposes. See *A. L. A. Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 530 (1935); *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 428–429 (1935). This Court has not been notably successful in describing the latter line; indeed, some think we have abandoned the effort to do so. See *FPC* v. *New England Power Co.,* 415 U. S. 345, 352–353 (1974) (Marshall, J., concurring in result); Schoenbrod, The Delegation Doctrine: Could the Court Give it Substance?, 83 Mich. L. Rev. 1223, 1233 (1985). We are doubtful that the new line the Government proposes would be any more distinct. Executive action that has utterly no policymaking component is rare, particularly at an executive level as high as a jurisdiction's chief law enforcement officer. Is it really true that there is no policymaking involved in deciding, for example, what "reasonable efforts" shall be expended to conduct a background check? It may well satisfy the Act for a CLEO to direct that (a) no background checks will be conducted that divert personnel time from pending felony investigations, and (b) no background check will be permitted to consume more than one-half hour of an officer's time. But nothing in the Act *requires* a CLEO to be so parsimonious; diverting at least

*some* felony-investigation time, and permitting at least *some* background checks beyond one-half hour would certainly not be *un*reasonable. Is this decision whether to devote maximum "reasonable efforts" or minimum "reasonable efforts" not preeminently a matter of policy? It is quite impossible, in short, to draw the Government's proposed line at "no policymaking," and we would have to fall back upon a line of "not too much policymaking." How much is too much is not likely to be answered precisely; and an imprecise barrier against federal intrusion upon state authority is not likely to be an effective one.

Even assuming, moreover, that the Brady Act leaves no "policymaking" discretion with the States, we fail to see how that improves rather than worsens the intrusion upon state sovereignty. Preservation of the States as independent and autonomous political entities is arguably less undermined by requiring them to make policy in certain fields than (as Judge Sneed aptly described it over two decades ago) by "reduc-[ing] [them] to puppets of a ventriloquist Congress," *Brown* v. *EPA*, 521 F. 2d, at 839. It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority. See *Texas* v. *White*, 7 Wall., at 725. It is no more compatible with this independence and autonomy that their officers be "dragooned" (as Judge Fernandez put it in his dissent below, 66 F. 3d, at 1035) into administering federal law, than it would be compatible with the independence and autonomy of the United States that its officers be impressed into service for the execution of state laws.

The Government purports to find support for its proffered distinction of *New York* in our decisions in *Testa* v. *Katt*, 330 U. S. 386 (1947), and *FERC* v. *Mississippi*, 456 U. S. 742 (1982). We find neither case relevant. *Testa* stands for the proposition that state courts cannot refuse to apply federal law—a conclusion mandated by the terms of the Supremacy Clause ("the Judges in every State shall be bound [by federal

law]"). As we have suggested earlier, *supra*, at 907, that says nothing about whether state executive officers must administer federal law. Accord, *New York*, 505 U. S., at 178–179. As for *FERC*, it stated (as we have described earlier) that "this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations," 456 U. S., at 761–762, and upheld the statutory provisions at issue precisely because they did *not* commandeer state government, but merely imposed preconditions to continued state regulation of an otherwise pre-empted field, in accord with *Hodel*, 452 U. S., at 288, and required state administrative agencies to apply federal law while acting in a judicial capacity, in accord with *Testa*, see *FERC, supra*, at 759–771, and n. 24.[14]

The Government also maintains that requiring state officers to perform discrete, ministerial tasks specified by Congress does not violate the principle of *New York* because it

---

[14] The dissent points out that *FERC* cannot be construed as merely following the principle recognized in *Testa* that state courts must apply relevant federal law because "[a]lthough the commission was serving an adjudicative function, the commissioners were unquestionably not 'judges' within the meaning of [the Supremacy Clause]." *Post*, at 969. That is true enough. But the answer to the question of which state officers *must* apply federal law (only "'judges' within the meaning of [the Supremacy Clause]") is different from the answer to the question of which state officers *may be required by statute* to apply federal law (officers who conduct adjudications similar to those traditionally performed by judges). It is within the power of the States, as it is within the power of the Federal Government, see *Crowell* v. *Benson*, 285 U. S. 22 (1932), to transfer some adjudicatory functions to administrative agencies, with opportunity for subsequent judicial review. But it is also within the power of Congress to prescribe, explicitly or by implication (as in the legislation at issue in *FERC*), that those adjudications must take account of federal law. The existence of this latter power should not be unacceptable to a dissent that believes distinguishing among officers on the basis of their title rather than the function they perform is "empty formalistic reasoning of the highest order," *post*, at 952. We have no doubt that *FERC* would not have been decided the way it was if *non*adjudicative responsibilities of the state agency were at issue.

does not diminish the accountability of state or federal officials. This argument fails even on its own terms. By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for "solving" problems without having to ask their constituents to pay for the solutions with higher federal taxes. And even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects. See Merritt, Three Faces of Federalism: Finding a Formula for the Future, 47 Vand. L. Rev. 1563, 1580, n. 65 (1994). Under the present law, for example, it will be the CLEO and not some federal official who stands between the gun purchaser and immediate possession of his gun. And it will likely be the CLEO, not some federal official, who will be blamed for any error (even one in the designated federal database) that causes a purchaser to be mistakenly rejected.

The dissent makes no attempt to defend the Government's basis for distinguishing New York, but instead advances what seems to us an even more implausible theory. The Brady Act, the dissent asserts, is different from the "take title" provisions invalidated in New York because the former is addressed to individuals—namely, CLEOs—while the latter were directed to the State itself. That is certainly a difference, but it cannot be a constitutionally significant one. While the Brady Act is directed to "individuals," it is directed to them in their official capacities as state officers; it controls their actions, not as private citizens, but as the agents of the State. The distinction between judicial writs and other government action directed against individuals in their personal capacity, on the one hand, and in their official capacity, on the other hand, is an ancient one, principally because it is dictated by common sense. We have observed that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against

the official's office. . . . As such, it is no different from a suit against the State itself." *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 71 (1989). And the same must be said of a directive to an official in his or her official capacity. To say that the Federal Government cannot control the State, but can control all of its officers, is to say nothing of significance.[15] Indeed, it merits the description "empty formalistic reasoning of the highest order," *post,* at 952. By resorting to this, the dissent not so much distinguishes *New York* as disembowels it.[16]

Finally, the Government puts forward a cluster of arguments that can be grouped under the heading: "The Brady Act serves very important purposes, is most efficiently ad-

_____

[15] Contrary to the dissent's suggestion, *post,* at 955–956, n. 16, and 965, the distinction in our Eleventh Amendment jurisprudence between States and municipalities is of no relevance here. We long ago made clear that the distinction is peculiar to the question of whether a governmental entity is entitled to Eleventh Amendment sovereign immunity, see *Monell* v. *New York City Dept. of Social Servs.,* 436 U. S. 658, 690, n. 55 (1978); we have refused to apply it to the question of whether a governmental entity is protected by the Constitution's guarantees of federalism, including the Tenth Amendment, see *National League of Cities* v. *Usery,* 426 U. S. 833, 855–856, n. 20 (1976) (overruled on other grounds by *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985)); see also *Garcia, supra* (resolving Tenth Amendment issues in suit brought by local transit authority).

[16] The dissent's suggestion, *post,* at 964, n. 27, that *New York* v. *United States,* 505 U. S. 144 (1992), itself embraced the distinction between congressional control of States (impermissible) and congressional control of state officers (permissible) is based upon the most egregious wrenching of statements out of context. It would take too much to reconstruct the context here, but by examining the entire passage cited, *id.,* at 178–179, the reader will readily perceive the distortion. The passage includes, for example, the following:

"Additional cases cited by the United States discuss the power of federal *courts* to order state officials to comply with federal law. . . . Again, however, the text of the Constitution plainly confers this authority on the federal courts . . . . The Constitution contains no analogous grant of authority to Congress." *Id.,* at 179.

ministered by CLEOs during the interim period, and places a minimal and only temporary burden upon state officers." There is considerable disagreement over the extent of the burden, but we need not pause over that detail. Assuming *all* the mentioned factors were true, they might be relevant if we were evaluating whether the incidental application to the States of a federal law of general applicability excessively interfered with the functioning of state governments. See, *e. g., Fry* v. *United States,* 421 U. S. 542, 548 (1975); *National League of Cities* v. *Usery,* 426 U. S. 833, 853 (1976) (overruled by *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985)); *South Carolina* v. *Baker,* 485 U. S. 505, 529 (1988) (REHNQUIST, C. J., concurring in judgment). But where, as here, it is the whole *object* of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a "balancing" analysis is inappropriate.[17] It is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect. Cf. *Bowsher,* 478 U. S., at 736 (declining to subject principle of separation of powers to a balancing test); *Chadha,* 462 U. S., at 944–946 (same); *Plaut* v. *Spendthrift Farm, Inc.,* 514 U. S.

---

[17] The dissent observes that "Congress could require private persons, such as hospital executives or school administrators, to provide arms merchants with relevant information about a prospective purchaser's fitness to own a weapon," and that "the burden on police officers [imposed by the Brady Act] would be permissible if a similar burden were also imposed on private parties with access to relevant data." *Post,* at 961. That is undoubtedly true, but it does not advance the dissent's case. The Brady Act does not merely require CLEOs to report information in their private possession. It requires them to provide information that belongs to the State and is available to them only in their official capacity; and to conduct investigation in their official capacity, by examining databases and records that only state officials have access to. In other words, the suggestion that extension of this statute to private citizens would eliminate the constitutional problem posits the impossible.

211, 239–240 (1995) (holding legislated invalidation of final judgments to be categorically unconstitutional). We expressly rejected such an approach in *New York,* and what we said bears repeating:

> "Much of the Constitution is. concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear 'formalistic' in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day." 505 U. S., at 187.

We adhere to that principle today, and conclude categorically, as we concluded categorically in *New York:* "The Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.,* at 188. The mandatory obligation imposed on CLEOs to perform background checks on prospective handgun purchasers plainly runs afoul of that rule.

## V

What we have said makes it clear enough that the central obligation imposed upon CLEOs by the interim provisions of the Brady Act—the obligation to "make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a handgun] would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General," 18 U. S. C. § 922(s)(2)—is unconstitutional. Extinguished with it, of course, is the duty implicit in the background-check requirement that the CLEO accept notice of the contents of, and a copy of, the completed Brady

Form, which the firearms dealer is required to provide to him, §§ 922(s)(1)(A)(i)(III) and (IV).

Petitioners also challenge, however, two other provisions of the Act: (1) the requirement that any CLEO "to whom a [Brady Form] is transmitted" destroy the form and any record containing information derived from it, § 922(s)(6)(B)(i), and (2) the requirement that any CLEO who "determines that an individual is ineligible to receive a handgun" provide the would-be purchaser, upon request, a written statement of the reasons for that determination, § 922(s)(6)(C). With the background-check and implicit receipt-of-forms requirements invalidated, however, these provisions require no action whatsoever on the part of the CLEO. Quite obviously, the obligation to destroy all Brady Forms that he has received when he has received none, and the obligation to give reasons for a determination of ineligibility when he never makes a determination of ineligibility, are no obligations at all. These two provisions have conceivable application to a CLEO, in other words, only if he has chosen, voluntarily, to participate in administration of the federal scheme. The present petitioners are not in that position.[18] As to them, these last two challenged provisions are not unconstitutional, but simply inoperative.

---

[18] We note, in this regard, that both CLEOs before us here assert that they are prohibited from taking on these federal responsibilities under state law. That assertion is clearly correct with regard to Montana law, which expressly enjoins any "county . . . or other local government unit" from "prohibit[ing] . . . or regulat[ing] the purchase, sale or other transfer (including delay in purchase, sale, or other transfer), ownership, [or] possession . . . of any . . . handgun," Mont. Code Ann. § 45–8–351(1) (1995). It is arguably correct with regard to Arizona law as well, which states that "[a] political subdivision of this state shall not . . . prohibit the ownership, purchase, sale or transfer of firearms," Ariz. Rev. Stat. Ann. § 13–3108(B) (1989). We need not resolve that question today; it is at least clear that Montana and Arizona do not require their CLEOs to implement the Brady Act, and CLEOs Printz and Mack have chosen not to do so.

There is involved in this Brady Act conundrum a severability question, which the parties have briefed and argued: whether firearms dealers in the jurisdictions at issue here, and in other jurisdictions, remain obliged to forward to the CLEO (even if he will not accept it) the requisite notice of the contents (and a copy) of the Brady Form, §§ 922(s)(1)(A)(i)(III) and (IV); and to wait five business days before consummating the sale, § 922(s)(1)(A)(ii). These are important questions, but we have no business answering them in these cases. These provisions burden only firearms dealers and purchasers, and no plaintiff in either of those categories is before us here. We decline to speculate regarding the rights and obligations of parties not before the Court. Cf., e. g., *New York*, *supra*, at 186–187 (addressing severability where remaining provisions at issue affected the plaintiffs).

\*     \*     \*

We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the States' officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty. Accordingly, the judgment of the Court of Appeals for the Ninth Circuit is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

Our precedent and our Nation's historical practices support the Court's holding today. The Brady Act violates the

Tenth Amendment to the extent it forces States and local law enforcement officers to perform background checks on prospective handgun owners and to accept Brady Forms from firearms dealers. See *ante*, at 922. Our holding, of course, does not spell the end of the objectives of the Brady Act. States and chief law enforcement officers may voluntarily continue to participate in the federal program. Moreover, the directives to the States are merely interim provisions scheduled to terminate November 30, 1998. Note following 18 U. S. C. § 922. Congress is also free to amend the interim program to provide for its continuance on a contractual basis with the States if it wishes, as it does with a number of other federal programs. See, *e. g.*, 23 U. S. C. § 402 (conditioning States' receipt of federal funds for highway safety program on compliance with federal requirements).

In addition, the Court appropriately refrains from deciding whether other purely ministerial reporting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid. See, *e. g.*, 42 U. S. C. § 5779(a) (requiring state and local law enforcement agencies to report cases of missing children to the Department of Justice). The provisions invalidated here, however, which directly compel state officials to administer a federal regulatory program, utterly fail to adhere to the design and structure of our constitutional scheme.

JUSTICE THOMAS, concurring.

The Court today properly holds that the Brady Act violates the Tenth Amendment in that it compels state law enforcement officers to "administer or enforce a federal regulatory program." See *ante*, at 935. Although I join the Court's opinion in full, I write separately to emphasize that the Tenth Amendment affirms the undeniable notion that under our Constitution, the Federal Government is one of enumerated, hence limited, powers. See, *e. g.*, *McCulloch* v.

*Maryland,* 4 Wheat. 316, 405 (1819) ("This government is acknowledged by all to be one of enumerated powers"). "[T]hat those limits may not be mistaken, or forgotten, the constitution is written." *Marbury* v. *Madison,* 1 Cranch 137, 176 (1803). Accordingly, the Federal Government may act only where the Constitution authorizes it to do so. Cf. *New York* v. *United States,* 505 U. S. 144 (1992).

In my "revisionist" view, see *post,* at 941 (STEVENS, J., dissenting), the Federal Government's authority under the Commerce Clause, which merely allocates to Congress the power "to regulate Commerce . . . among the several States," does not extend to the regulation of wholly *intra*state, point-of-sale transactions. See *United States* v. *Lopez,* 514 U. S. 549, 584 (1995) (concurring opinion). Absent the underlying authority to regulate the intrastate transfer of firearms, Congress surely lacks the corollary power to impress state law enforcement officers into administering and enforcing such regulations. Although this Court has long interpreted the Constitution as ceding Congress extensive authority to regulate commerce (interstate or otherwise), I continue to believe that we must "temper our Commerce Clause jurisprudence" and return to an interpretation better rooted in the Clause's original understanding. *Id.,* at 601 (concurring opinion); see also *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison,* 520 U. S. 564, 620 (1997) (THOMAS, J., dissenting).

Even if we construe Congress' authority to regulate interstate commerce to encompass those intrastate transactions that "substantially affect" interstate commerce, I question whether Congress can regulate the particular transactions at issue here. The Constitution, in addition to delegating certain enumerated powers to Congress, places whole areas outside the reach of Congress' regulatory authority. The First Amendment, for example, is fittingly celebrated for preventing Congress from "prohibiting the free exercise" of religion or "abridging the freedom of speech." The Second

Amendment similarly appears to contain an express limitation on the Government's authority. That Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." This Court has not had recent occasion to consider the nature of the substantive right safeguarded by the Second Amendment.[1] If, however, the Second Amendment is read to confer a *personal* right to "keep and bear arms," a colorable argument exists that the Federal Government's regulatory scheme, at least as it pertains to the purely intrastate sale or possession of firearms, runs afoul of that Amendment's protections.[2] As the parties did

---

[1] Our most recent treatment of the Second Amendment occurred in *United States* v. *Miller*, 307 U. S. 174 (1939), in which we reversed the District Court's invalidation of the National Firearms Act, enacted in 1934. In *Miller*, we determined that the Second Amendment did not guarantee a citizen's right to possess a sawed-off shotgun because that weapon had not been shown to be "ordinary military equipment" that could "contribute to the common defense." *Id.*, at 178. The Court did not, however, attempt to define, or otherwise construe, the substantive right protected by the Second Amendment.

[2] Marshaling an impressive array of historical evidence, a growing body of scholarly commentary indicates that the "right to keep and bear arms" is, as the Amendment's text suggests, a personal right. See, *e. g.*, J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 162 (1994); S. Halbrook, That Every Man Be Armed, The Evolution of a Constitutional Right (1984); Van Alstyne, The Second Amendment and the Personal Right to Arms, 43 Duke L. J. 1236 (1994); Amar, The Bill of Rights and the Fourteenth Amendment, 101 Yale L. J. 1193 (1992); Cottrol & Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L. J. 309 (1991); Levinson, The Embarrassing Second Amendment, 99 Yale L. J. 637 (1989); Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204 (1983). Other scholars, however, argue that the Second Amendment does not secure a personal right to keep or to bear arms. See, *e. g.*, Bogus, Race, Riots, and Guns, 66 S. Cal. L. Rev. 1365 (1993); Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L. J. 551 (1991); Brown, Guns, Cowboys, Philadelphia Mayors, and Civic Republicanism: On Sanford Levinson's The Embarrassing Second Amendment, 99 Yale L. J. 661 (1989); Cress, An Armed Community: The

not raise this argument, however, we need not consider it here. Perhaps, at some future date, this Court will have the opportunity to determine whether Justice Story was correct when he wrote that the right to bear arms "has justly been considered, as the palladium of the liberties of a republic." 3 J. Story, Commentaries § 1890, p. 746 (1833). In the meantime, I join the Court's opinion striking down the challenged provisions of the Brady Act as inconsistent with the Tenth Amendment.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

When Congress exercises the powers delegated to it by the Constitution, it may impose affirmative obligations on executive and judicial officers of state and local governments as well as ordinary citizens. This conclusion is firmly supported by the text of the Constitution, the early history of the Nation, decisions of this Court, and a correct understanding of the basic structure of the Federal Government.

These cases do not implicate the more difficult questions associated with congressional coercion of state legislatures addressed in *New York* v. *United States*, 505 U. S. 144 (1992). Nor need we consider the wisdom of relying on local officials rather than federal agents to carry out aspects of a federal program, or even the question whether such officials may be required to perform a federal function on a permanent basis. The question is whether Congress, acting on behalf of the people of the entire Nation, may require local law enforcement officers to perform certain duties during the interim needed for the development of a federal gun control program. It is remarkably similar to the question, heavily debated by the Framers of the Constitution, whether Congress could require state agents to collect federal taxes. Or the question

---

Origins and Meaning of the Right to Bear Arms, 71 J. Am. Hist. 22 (1984). Although somewhat overlooked in our jurisprudence, the Amendment has certainly engendered considerable academic, as well as public, debate.

whether Congress could impress state judges into federal service to entertain and decide cases that they would prefer to ignore.

Indeed, since the ultimate issue is one of power, we must consider its implications in times of national emergency. Matters such as the enlistment of air raid wardens, the administration of a military draft, the mass inoculation of children to forestall an epidemic, or perhaps the threat of an international terrorist, may require a national response before federal personnel can be made available to respond. If the Constitution empowers Congress and the President to make an appropriate response, is there anything in the Tenth Amendment, "in historical understanding and practice, in the structure of the Constitution, [or] in the jurisprudence of this Court," *ante,* at 905, that forbids the enlistment of state officers to make that response effective? More narrowly, what basis is there in any of those sources for concluding that it is the Members of this Court, rather than the elected representatives of the people, who should determine whether the Constitution contains the unwritten rule that the Court announces today?

Perhaps today's majority would suggest that no such emergency is presented by the facts of these cases. But such a suggestion is itself an expression of a policy judgment. And Congress' view of the matter is quite different from that implied by the Court today.

The Brady Act was passed in response to what Congress described as an "epidemic of gun violence." H. R. Rep. No. 103–344, p. 8 (1993). The Act's legislative history notes that 15,377 Americans were murdered with firearms in 1992, and that 12,489 of these deaths were caused by handguns. *Ibid.* Congress expressed special concern that "[t]he level of firearm violence in this country is, by far, the highest among developed nations." *Ibid.* The partial solution contained in the Brady Act, a mandatory background check before a

handgun may be purchased, has met with remarkable success. Between 1994 and 1996, approximately 6,600 firearm sales each month to potentially dangerous persons were prevented by Brady Act checks; over 70% of the rejected purchasers were convicted or indicted felons. See U. S. Dept. of Justice, Bureau of Justice Statistics Bulletin, A National Estimate: Presale Firearm Checks 1 (Feb. 1997). Whether or not the evaluation reflected in the enactment of the Brady Act is correct as to the extent of the danger and the efficacy of the legislation, the congressional decision surely warrants more respect than it is accorded in today's unprecedented decision.

I

The text of the Constitution provides a sufficient basis for a correct disposition of these cases.

Article I, § 8, grants Congress the power to regulate commerce among the States. Putting to one side the revisionist views expressed by JUSTICE THOMAS in his concurring opinion in *United States* v. *Lopez*, 514 U. S. 549, 584 (1995), there can be no question that that provision adequately supports the regulation of commerce in handguns effected by the Brady Act. Moreover, the additional grant of authority in that section of the Constitution "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers" is surely adequate to support the temporary enlistment of local police officers in the process of identifying persons who should not be entrusted with the possession of handguns. In short, the affirmative delegation of power in Article I provides ample authority for the congressional enactment.

Unlike the First Amendment, which prohibits the enactment of a category of laws that would otherwise be authorized by Article I, the Tenth Amendment imposes no restriction on the exercise of delegated powers. Using language

that plainly refers only to powers that are *"not"* delegated to Congress, it provides:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U. S. Const., Amdt. 10.

The Amendment confirms the principle that the powers of the Federal Government åre limited to those affirmatively granted by the Constitution, but it does not purport to limit the scope or the effectiveness of the exercise of powers that are delegated to Congress.[1]  See *New York* v. *United States*, 505 U. S., at 156 ("In a case . . . involving the division of authority between federal and state governments, the two inquiries are mirror images of each other"). Thus, the Amendment provides no support for a rule that immunizes local officials from obligations that might be imposed on ordinary citizens.[2]  Indeed, *it would be more reasonable to infer*

---

[1] Indeed, the Framers repeatedly rejected proposed changes to the Tenth Amendment that would have altered the text to refer to "powers not *expressly* delegated to the United States." 3 W. Crosskey & W. Jeffrey, Politics and the Constitution in the History of the United States 36 (1980). This was done, as Madison explained, because "it was impossible to confine a Government to the exercise of express powers; there must necessarily be admitted powers by implication, unless the constitution descended to recount every minutia." 1 Annals of Cong. 790 (Aug. 18, 1789); see *McCulloch* v. *Maryland*, 4 Wheat. 316, 406–407 (1819).

[2] Recognizing the force of the argument, the Court suggests that this reasoning is in error because—even if it is responsive to the submission that the Tenth Amendment roots the principle set forth by the majority today—it does not answer the possibility that the Court's holding can be rooted in a "principle of state sovereignty" mentioned nowhere in the constitutional text. See *ante*, at 923–924. As a ground for invalidating important federal legislation, this argument is remarkably weak. The majority's further claim that, while the Brady Act may be legislation "necessary" to Congress' execution of its undisputed Commerce Clause authority to regulate firearms sales, it is nevertheless not "proper" because it violates state sovereignty, see *ibid.*, is wholly circular, and provides no traction for its argument. Moreover, this reading of the term

that federal law may impose greater duties on state officials than on private citizens because another provision of the Constitution requires that "all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution." Art. VI, cl. 3.

It is appropriate for state officials to make an oath or affirmation to support the Federal Constitution because, as explained in The Federalist, they "have an essential agency in giving effect to the federal Constitution." The Federalist No. 44, p. 312 (E. Bourne ed. 1947) (J. Madison).[3] There can be no conflict between their duties to the State and those owed to the Federal Government because Article VI unambiguously provides that federal law "shall be the supreme Law of the Land," binding in every State. U. S. Const., Art.

---

"proper" gives it a meaning directly contradicted by Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819). As the Chief Justice explained, the Necessary and Proper Clause by "[i]ts terms purport[s] to enlarge, not to diminish the powers vested in the government. It purports to be an additional power, not a restriction on those already granted." *Id.*, at 420; see also *id.*, at 418–419 (explaining that "the only possible effect" of the use of the term "proper" was "to present to the mind the idea of some choice of means of legislation not straitened and compressed within . . . narrow limits").

Our ruling in *New York* that the Commerce Clause does not provide Congress the authority to require States to enact legislation—a power that affects States far closer to the core of their sovereign authority—does nothing to support the majority's unwarranted extension of that reasoning today.

[3] "It has been asked why it was thought necessary, that the State magistracy should be bound to support the federal Constitution, and unnecessary that a like oath should be imposed on the officers of the united states, in favor of the State constitutions.

"Several reasons might be assigned for the distinction. I content myself with one, which is obvious and conclusive. The members of the federal government will have no agency in carrying the State constitutions into effect. The members and officers of the State governments, on the contrary, will have an essential agency in giving effect to the federal Constitution." The Federalist No. 44, at 312 (J. Madison).

VI, cl. 2. Thus, not only the Constitution, but every law enacted by Congress as well, establishes policy for the States just as firmly as do laws enacted by state legislatures.

The reasoning in our unanimous opinion explaining why state tribunals with ordinary jurisdiction over tort litigation can be required to hear cases arising under the Federal Employers' Liability Act applies equally to local law enforcement officers whose ordinary duties parallel the modest obligations imposed by the Brady Act:

> "The suggestion that the act of Congress is not in harmony with the policy of the State, and therefore that the courts of the State are free to decline jurisdiction, is quite inadmissible, because it presupposes what in legal contemplation does not exist. When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for all the people and all the States, and thereby established a policy for all. That policy is as much the policy of Connecticut as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the State. As was said by this court in *Claflin* v. *Houseman*, 93 U. S. 130, 136, 137:
>
> "'The laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are. The United States is not a foreign sovereignty as regards the several States, but is a concurrent, and, within its jurisdiction, paramount sovereignty.'" *Second Employers' Liability Cases,* 223 U. S. 1, 57 (1912).

See also *Testa* v. *Katt,* 330 U. S. 386, 392 (1947).

There is not a clause, sentence, or paragraph in the entire text of the Constitution of the United States that supports the proposition that a local police officer can ignore a command contained in a statute enacted by Congress pursuant to an express delegation of power enumerated in Article I.

## II

Under the Articles of Confederation the National Government had the power to issue commands to the several sovereign States, but it had no authority to govern individuals directly. Thus, it raised an army and financed its operations by issuing requisitions to the constituent members of the Confederacy, rather than by creating federal agencies to draft soldiers or to impose taxes.

That method of governing proved to be unacceptable, not because it demeaned the sovereign character of the several States, but rather because it was cumbersome and inefficient. Indeed, a confederation that allows each of its members to determine the ways and means of complying with an overriding requisition is obviously more deferential to state sovereignty concerns than a national government that uses its own agents to impose its will directly on the citizenry. The basic change in the character of the government that the Framers conceived was designed to enhance the power of the National Government, not to provide some new, unmentioned immunity for state officers. Because indirect control over individual citizens ("the only proper objects of government") was ineffective under the Articles of Confederation, Alexander Hamilton explained that "we must *extend* the authority of the Union to the persons of the citizens." The Federalist No. 15, at 101 (emphasis added).

Indeed, the historical materials strongly suggest that the founders intended to enhance the capacity of the Federal Government by empowering it—as a part of the new authority to make demands directly on individual citizens—to act through local officials. Hamilton made clear that the new Constitution, "by extending the authority of the federal head to the individual citizens of the several States, will enable the government to employ the ordinary magistracy of each in the execution of its laws." The Federalist No. 27, at 180. Hamilton's meaning was unambiguous; the Federal Government was to have the power to demand that local officials

implement national policy programs. As he went on to explain: "It is easy to perceive that this will tend to destroy, in the common apprehension, all distinction between the sources from which [the State and Federal Governments] might proceed; and will give the federal government the same advantage for securing a due obedience to its authority which is enjoyed by the government of each State." *Ibid.*[4]

More specifically, during the debates concerning the ratification of the Constitution, it was assumed that state agents would act as tax collectors for the Federal Government. Opponents of the Constitution had repeatedly expressed fears that the new Federal Government's ability to impose taxes directly on the citizenry would result in an overbearing presence of federal tax collectors in the States.[5] Federalists rejoined that this problem would not arise because, as Hamilton explained, "the United States . . . will make use of the State officers and State regulations for collecting" certain

---

[4] The notion that central government would rule by directing the actions of local magistrates was scarcely a novel conception at the time of the founding. Indeed, as an eminent scholar recently observed: "At the time the Constitution was being framed . . . Massachusetts had virtually no administrative apparatus of its own but used the towns for such purposes as tax gathering. In the 1830s Tocqueville observed this feature of government in New England and praised it for its ideal combination of centralized legislation and decentralized administration." S. Beer, To Make a Nation: The Rediscovery of American Federalism 252 (1993). This may have provided a model for the expectation of "Madison himself . . . [that] the new federal government [would] govern through the state governments, rather in the manner of the New England states in relation to their local governments." *Ibid.*

[5] See, *e. g.*, 1 Debate on the Constitution 502 (B. Bailyn ed. 1993) (statement of "Brutus" that the new Constitution would "ope[n] a door to the appointment of a swarm of revenue and excise officers to prey upon the honest and industrious part of the community"); 2 *id.*, at 633 (statement of Patrick Henry at the Virginia Convention that "the salaries and fees of the swarm of officers and dependants on the Government will cost this Continent immense sums" and noting that "[d]ouble sets of [tax] collectors will double the expence").

taxes. *Id.*, No. 36, at 235. Similarly, Madison made clear that the new central Government's power to raise taxes directly from the citizenry would "not be resorted to, except for supplemental purposes of revenue . . . and that the eventual collection, under the immediate authority of the Union, will generally be made by the officers . . . appointed by the several States." *Id.*, No. 45, at 318.[6]

The Court's response to this powerful historical evidence is weak. The majority suggests that "none of these statements necessarily implies . . . Congress could impose these responsibilities without the consent of the States." *Ante*, at 910–911 (emphasis deleted). No fair reading of these materials can justify such an interpretation. As Hamilton explained, the power of the Government to act on "individual citizens"—including "employ[ing] the ordinary magistracy" of the States—was an answer to the problems faced by a central Government that could act only directly "upon the States in their political or collective capacities." The Federalist, No. 27, at 179–180. The new Constitution would avoid this problem, resulting in "a regular and peaceable execution of the laws of the Union." *Ibid.*

This point is made especially clear in Hamilton's statement that "the legislatures, courts, and magistrates, of the respective members, will be incorporated into the operations of the national government *as far as its just and constitutional authority extends; and will be rendered auxiliary to the enforcement of its laws." Ibid.* (second emphasis added). It is hard to imagine a more unequivocal statement that state

---

[6] Antifederalists acknowledged this response, and recognized the likelihood that the Federal Government would rely on state officials to collect its taxes. See, *e. g.*, 3 J. Elliot, Debates on the Federal Constitution 167–168 (2d ed. 1891) (statement of Patrick Henry). The wide acceptance of this point by all participants in the framing casts serious doubt on the majority's efforts, see *ante*, at 915–916, n. 9, to suggest that the view that state officials could be called upon to implement federal programs was somehow an unusual or peculiar position.

judicial and executive branch officials may be required to implement federal law where the National Government acts within the scope of its affirmative powers.[7]

The Court makes two unpersuasive attempts to discount the force of this statement. First, according to the majority, because Hamilton mentioned the Supremacy Clause without specifically referring to any "congressional directive," the statement does not mean what it plainly says. *Ante*, at 912. But the mere fact that the Supremacy Clause is the source of the obligation of state officials to implement congressional directives does not remotely suggest that they might be " 'incorporat[ed] into the operations of the national government,' " The Federalist No. 27, at 177 (A. Hamilton), before their obligations have been defined by Congress. Federal law establishes policy for the States just as firmly as laws enacted by state legislatures, but that does not mean that state or federal officials must implement directives that have not been specified in any law.[8] Second, the majority suggests that interpreting this passage to mean what it says would conflict with our decision in *New York* v. *United States*. *Ante*, at 912. But since the *New York* opinion did not mention The Federalist No. 27, it does not affect either the relevance or the weight of the historical evidence provided by No. 27 insofar as it relates to state courts and magistrates.

Bereft of support in the history of the founding, the Court rests its conclusion on the claim that there is little evidence the National Government actually exercised such a power in

---

[7] Hamilton recognized the force of his comments, acknowledging but rejecting opponents' "sophist[ic]" arguments to the effect that this position would "tend to the destruction of the State governments." The Federalist No. 27, at 180, n.

[8] Indeed, the majority's suggestion that this consequence flows "automatically" from the officers' oath, *ante*, at 912 (emphasis deleted), is entirely without foundation in the quoted text. Although the fact that the Court has italicized the word "automatically" may give the reader the impression that it is a word Hamilton used, that is not so.

the early years of the Republic. See *ante*, at 907–908. This reasoning is misguided in principle and in fact. While we have indicated that the express consideration and resolution of difficult constitutional issues by the First Congress in particular "provides 'contemporaneous and weighty evidence' of the Constitution's meaning since many of [its] Members . . . 'had taken part in framing that instrument,'" *Bowsher* v. *Synar*, 478 U. S. 714, 723–724 (1986) (quoting *Marsh* v. *Chambers*, 463 U. S. 783, 790 (1983)), we have never suggested that the failure of the early Congresses to address the scope of federal power in a particular area or to exercise a particular authority was an argument against its existence. That position, if correct, would undermine most of our post-New Deal Commerce Clause jurisprudence. As JUSTICE O'CONNOR quite properly noted in *New York*, "[t]he Federal Government undertakes activities today that would have been unimaginable to the Framers." 505 U. S., at 157.

More importantly, the fact that Congress did elect to rely on state judges and the clerks of state courts to perform a variety of executive functions, see *ante*, at 905–909, is surely evidence of a contemporary understanding that their status as state officials did not immunize them from federal service. The majority's description of these early statutes is both incomplete and at times misleading.

For example, statutes of the early Congresses required in mandatory terms that state judges and their clerks perform various executive duties with respect to applications for citizenship. The First Congress enacted a statute requiring that the state courts consider such applications, specifying that the state courts "*shall* administer" an oath of loyalty to the United States, and that "the clerk of such court *shall* record such application." Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103 (emphasis added). Early legislation passed by the Fifth Congress also imposed reporting requirements relating to naturalization on court clerks, specifying that failure to perform those duties would result in a fine. Act of June 18,

1798, ch. 54, § 2, 1 Stat. 567 (specifying that these obligations *"shall* be the duty of the clerk" (emphasis added)). Not long thereafter, the Seventh Congress mandated that state courts maintain a registry of aliens seeking naturalization. Court clerks were required to receive certain information from aliens, record those data, and provide certificates to the aliens; the statute specified fees to be received by local officials in compensation. Act of Apr. 14, 1802, ch. 28, § 2, 2 Stat. 154–155 (specifying that these burdens *"shall* be the duty of such clerk" including clerks "of a . . . state" (emphasis added)).[9]

Similarly, the First Congress enacted legislation requiring state courts to serve, functionally, like contemporary regula-

---

[9] The majority asserts that these statutes relating to the administration of the federal naturalization scheme are not proper evidence of the original understanding because over a century later, in *Holmgren* v. *United States*, 217 U. S. 509 (1910), this Court observed that that case did not present the question whether the States can be required to enforce federal laws "against their consent," *id.*, at 517. The majority points to similar comments in *United States* v. *Jones*, 109 U. S. 513, 519–520 (1883). See *ante*, at 906.

Those cases are unpersuasive authority. First, whatever their statements in dicta, the naturalization statutes at issue there, as made clear in the text, were framed in quite mandatory terms. Even the majority only goes so far as to say that "[i]t may well be" that these facially mandatory statutes in fact rested on voluntary state participation. *Ibid.* Any suggestion to the contrary is belied by the language of the statutes themselves.

Second, both of the cases relied upon by the majority rest on now-rejected doctrine. In *Jones*, the Court indicated that various duties, including the requirement that state courts of appropriate jurisdiction hear federal questions, "could not be enforced against the consent of the States." 109 U. S., at 520. That view was unanimously resolved to the contrary thereafter in the *Second Employers' Liability Cases*, 223 U. S. 1, 57 (1912), and in *Testa* v. *Katt*, 330 U. S. 386 (1947).

Finally, the Court suggests that the obligation set forth in the latter two cases that state courts hear federal claims is "voluntary" in that States need not create courts of ordinary jurisdiction. That is true, but unhelpful to the majority. If a State chooses to have no local law enforcement officials it may avoid the Brady Act's requirements, and if it chooses to have no courts it may avoid *Testa*. But neither seems likely.

tory agencies in certifying the seaworthiness of vessels. Act of July 20, 1790, ch. 29, §3, 1 Stat. 132–133. The majority casts this as an adjudicative duty, *ante*, at 907, but that characterization is misleading. The law provided that upon a complaint raised by a ship's crew members, the state courts were (if no federal court was proximately located) to appoint an investigative committee of three persons "most skilful in maritime affairs" to report back. On this basis, the judge was to determine whether the ship was fit for its intended voyage. The statute sets forth, in essence, procedures for an expert inquisitorial proceeding, supervised by a judge but otherwise more characteristic of executive activity.[10]

The Court assumes that the imposition of such essentially executive duties on state judges and their clerks sheds no light on the question whether executive officials might have an immunity from federal obligations. *Ibid.* Even assuming that the enlistment of state judges in their judicial role for federal purposes is irrelevant to the question whether executive officials may be asked to perform the same function—a claim disputed below, see *infra*, at 968–970—the majority's analysis is badly mistaken.

We are far truer to the historical record by applying a functional approach in assessing the role played by these early state officials. The use of state judges and their clerks to perform executive functions was, in historical context, hardly unusual. As one scholar has noted, "two centuries ago, state and local judges and associated judicial personnel

---

[10] Other statutes mentioned by the majority are also wrongly miscategorized as involving essentially judicial matters. For example, the Fifth Congress enacted legislation requiring state courts to serve as repositories for reporting what amounted to administrative claims against the United States Government, under a statute providing compensation in land to Canadian refugees who had supported the United States during the Revolutionary War. Contrary to the majority's suggestion, that statute did not amount to a requirement that state courts adjudicate claims, see *ante*, at 908, n. 2; final decisions as to appropriate compensation were made by federal authorities, see Act of Apr. 7, 1798, ch. 26, §3, 1 Stat. 548.

performed many of the functions today performed by executive officers, including such varied tasks as laying city streets and ensuring the seaworthiness of vessels." Caminker, State Sovereignty and Subordinacy: May Congress Commandeer State Officers to Implement Federal Law?, 95 Colum. L. Rev. 1001, 1045, n. 176 (1995). And, of course, judges today continue to perform a variety of functions that may more properly be described as executive. See, e. g., Forrester v. White, 484 U. S. 219, 227 (1988) (noting "intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform"). The majority's insistence that this evidence of federal enlistment of state officials to serve executive functions is irrelevant simply because the assistance of "judges" was at issue rests on empty formalistic reasoning of the highest order.[11]

The Court's evaluation of the historical evidence, furthermore, fails to acknowledge the important difference between

---

[11] Able to muster little response other than the bald claim that this argument strikes the majority as "doubtful," *ante*, at 908, n. 2, the Court proceeds to attack the basic point that the statutes discussed above called state judges to serve what were substantially executive functions. The argument has little force. The majority's view that none of the statutes referred to in the text required judges to perform anything other than "quintessentially adjudicative tasks[s]," *ibid.*, is quite wrong. The evaluation of applications for citizenship and the acceptance of Revolutionary War claims, for example, both discussed above, are hard to characterize as the sort of adversarial proceedings to which common-law courts are accustomed. As for the majority's suggestion that the substantial administrative requirements imposed on state-court clerks under the naturalization statutes are merely "ancillary" and therefore irrelevant, this conclusion is in considerable tension with the Court's holding that the minor burden imposed by the Brady Act violates the Constitution. Finally, the majority's suggestion that the early statute requiring state courts to assess the seaworthiness of vessels is essentially adjudicative in nature is not compelling. Activities of this sort, although they may bear some resemblance to traditional common-law adjudication, are far afield from the classical model of adversarial litigation.

policy decisions that may have been influenced by respect for state sovereignty concerns, and decisions that are compelled by the Constitution.[12] Thus, for example, the decision by Congress to give President Wilson the authority to utilize the services of state officers in implementing the World War I draft, see Act of May 18, 1917, ch. 15, §6, 40 Stat. 80–81, surely indicates that the National Legislature saw no constitutional impediment to the enlistment of state assistance during a federal emergency. The fact that the President was able to implement the program by respectfully "request-[ing]" state action, rather than bluntly commanding it, is evidence that he was an effective statesman, but surely does not indicate that he doubted either his or Congress' power to use mandatory language if necessary.[13] If there were merit to the Court's appraisal of this incident, one would assume that there would have been some contemporary comment on the supposed constitutional concern that hypothetically might have motivated the President's choice of language.[14]

---

[12] Indeed, an entirely appropriate concern for the prerogatives of state government readily explains Congress' sparing use of this otherwise "highly attractive," *ante*, at 905, 908, power. Congress' discretion, contrary to the majority's suggestion, indicates not that the power does not exist, but rather that the interests of the States are more than sufficiently protected by their participation in the National Government. See *infra*, at 956–957.

[13] Indeed, the very commentator upon whom the majority relies noted that the "President *might*, under the act, have issued orders directly to every state officer, and this would have been, for war purposes, a justifiable Congressional grant of all state powers into the President's hands." Note, The President, The Senate, The Constitution, and the Executive Order of May 8, 1926, 21 U. Ill. L. Rev. 142, 144 (1926).

[14] Even less probative is the Court's reliance on the decision by Congress to authorize federal marshals to rent temporary jail facilities instead of insisting that state jailkeepers house federal prisoners at federal expense. See *ante*, at 909–910. The majority finds constitutional significance in the fact that the First Congress (apparently following practice appropriate under the Articles of Confederation) had issued a request to state legisla-

The Court concludes its review of the historical materials with a reference to the fact that our decision in *INS* v. *Chadha*, 462 U. S. 919 (1983), invalidated a large number of statutes enacted in the 1970's, implying that recent enactments by Congress that are similar to the Brady Act are not entitled to any presumption of validity. But in *Chadha*, unlike these cases, our decision rested on the Constitution's express bicameralism and presentment requirements, *id.*, at 946, not on judicial inferences drawn from a silent text and a historical record that surely favors the congressional understanding. Indeed, the majority's opinion consists almost entirely of arguments *against* the substantial evidence weighing in opposition to its view; the Court's ruling is strikingly lacking in affirmative support. Absent even a modicum of textual foundation for its judicially crafted constitutional rule, there should be a presumption that if the Framers had actually intended such a rule, at least one of them would have mentioned it.[15]

---

tures rather than a command to state jailkeepers, see Resolution of Sept. 29, 1789, 1 Stat. 96, and the further fact that it chose not to change that request to a command 18 months later, see Resolution of Mar. 3, 1791, 1 Stat. 225. The Court does not point us to a single comment by any Member of Congress suggesting that either decision was motivated in the slightest by constitutional doubts. If this sort of unexplained congressional action provides sufficient historical evidence to support the fashioning of judge-made rules of constitutional law, the doctrine of judicial restraint has a brief, though probably colorful, life expectancy.

[15] Indeed, despite the exhaustive character of the Court's response to this dissent, it has failed to find even an iota of evidence that any of the Framers of the Constitution or any Member of Congress who supported or opposed the statutes discussed in the text ever expressed doubt as to the power of Congress to impose federal responsibilities on local judges or police officers. Even plausible rebuttals of evidence consistently pointing in the other direction are no substitute for affirmative evidence. In short, a neutral historian would have to conclude that the Court's discussion of history does not even begin to establish a prima facie case.

## III

The Court's "structural" arguments are not sufficient to rebut that presumption. The fact that the Framers intended to preserve the sovereignty of the several States simply does not speak to the question whether individual state employees may be required to perform federal obligations, such as registering young adults for the draft, 40 Stat. 80–81, creating state emergency response commissions designed to manage the release of hazardous substances, 42 U. S. C. §§ 11001, 11003, collecting and reporting data on underground storage tanks that may pose an environmental hazard, § 6991a, and reporting traffic fatalities, 23 U. S. C. § 402(a), and missing children, 42 U. S. C. § 5779(a), to a federal agency.[16]

---

[16] The majority's argument is particularly peculiar because these cases do not involve the enlistment of *state* officials at all, but only an effort to have federal policy implemented by officials of *local* government. Both Sheriffs Printz and Mack are county officials. Given that the Brady Act places its interim obligations on chief law enforcement officers (CLEO's), who are defined as "the chief of police, the sheriff, or an equivalent officer," 18 U. S. C. § 922(s)(8), it seems likely that most cases would similarly involve local government officials.

This Court has not had cause in its recent federalism jurisprudence to address the constitutional implications of enlisting nonstate officials for federal purposes. (We did pass briefly on the issue in a footnote in *National League of Cities* v. *Usery*, 426 U. S. 833, 855, n. 20 (1976), but that case was overruled in its entirety by *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985). The question was not called to our attention in *Garcia* itself.) It is therefore worth noting that the majority's decision is in considerable tension with our Eleventh Amendment sovereign immunity cases. Those decisions were designed to "accor[d] the States the respect owed them as members of the federation." *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 146 (1993). But despite the fact that "political subdivisions exist solely at the whim and behest of their State," *Port Authority Trans-Hudson Corp.* v. *Feeney*, 495 U. S. 299, 313 (1990) (Brennan, J., concurring in part and concurring in judgment), we have "consistently refused to

As we explained in *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985): "[T]he principal means chosen by the Framers to ensure the role of the States in the federal system lies in the structure of the Federal Government itself. It is no novelty to observe that the composition of the Federal Government was designed in large part to protect the States from overreaching by Congress." *Id.*, at 550–551. Given the fact that the Members of Congress are elected by the people of the several States, with each State receiving an equivalent number of Senators in order to ensure that even the smallest States have a powerful voice in the Legislature, it is quite unrealistic to assume that they will ignore the sovereignty concerns of their constituents. It is far more reasonable to presume that their decisions to impose modest burdens on state officials from time to time reflect a considered judgment that the people in each of the States will benefit therefrom.

Indeed, the presumption of validity that supports all congressional enactments [17] has added force with respect to pol-

construe the Amendment to afford protection to political subdivisions such as counties and municipalities." *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 401 (1979); see also *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30, 47 (1994). Even if the protections that the majority describes as rooted in the Tenth Amendment ought to benefit state officials, it is difficult to reconcile the decision to extend these principles to local officials with our refusal to do so in the Eleventh Amendment context. If the federal judicial power may be exercised over local government officials, it is hard to see why they are not subject to the legislative power as well.

[17] "Whenever called upon to judge the constitutionality of an Act of Congress—'the gravest and most delicate duty that this Court is called upon to perform,' *Blodgett* v. *Holden*, 275 U. S. 142, 148 (1927) (Holmes, J.)—the Court accords 'great weight to the decisions of Congress.' *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 102 (1973). The Congress is a coequal branch of Government whose Members take the same oath we do to uphold the Constitution of the United States. As Justice Frankfurter noted in *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123, 164 (1951) (concurring opinion),

icy judgments concerning the impact of a federal statute upon the respective States. The majority points to nothing suggesting that the political safeguards of federalism identified in *Garcia* need be supplemented by a rule, grounded in neither constitutional history nor text, flatly prohibiting the National Government from enlisting state and local officials in the implementation of federal law.

Recent developments demonstrate that the political safeguards protecting Our Federalism are effective. The majority expresses special concern that were its rule not adopted the Federal Government would be able to avail itself of the services of state government officials "at no cost to itself." *Ante*, at 922; see also *ante*, at 930 (arguing that "Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes"). But this specific problem of federal actions that have the effect of imposing so-called "unfunded mandates" on the States has been identified and meaningfully addressed by Congress in recent legislation.[18] See Un-

---

we must have 'due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government.'" *Rostker* v. *Goldberg*, 453 U. S. 57, 64 (1981).

[18] The majority also makes the more general claim that requiring state officials to carry out federal policy causes States to "tak[e] the blame" for failed programs. *Ante*, at 930. The Court cites no empirical authority to support the proposition, relying entirely on the speculations of a law review article. This concern is vastly overstated.

Unlike state legislators, local government executive officials routinely take action in response to a variety of sources of authority: local ordinance, state law, and federal law. It doubtless may therefore require some sophistication to discern under which authority an executive official is acting, just as it may not always be immediately obvious what legal source of authority underlies a judicial decision. In both cases, affected citizens must look past the official before them to find the true cause of their grievance. See *FERC* v. *Mississippi*, 456 U. S. 742, 785 (1982) (O'CONNOR, J., concurring in part and dissenting in part) (legislators differ from judges

funded Mandates Reform Act of 1995, Pub. L. 104–4, 109 Stat. 48.

The statute was designed "to end the imposition, in the absence of full consideration by Congress, of Federal mandates on State . . . governments without adequate Federal funding, in a manner that may displace other essential State . . . governmental priorities." 2 U. S. C. § 1501(2) (1994 ed., Supp. II). It functions, *inter alia*, by permitting Members of Congress to raise an objection by point of order to a pending bill that contains an "unfunded mandate," as defined by the statute, of over $50 million.[19] The mandate may not then be enacted unless the Members make an explicit decision to proceed anyway. See Recent Legislation, Unfunded Mandates Reform Act of 1995, 109 Harv. L. Rev. 1469 (1996) (describing functioning of statute). Whatever the ultimate impact of the new legislation, its passage demonstrates that

---

because legislators have "the power to choose subjects for legislation"). But the majority's rule neither creates nor alters this basic truth.

The problem is of little real consequence in any event, because to the extent that a particular action proves politically unpopular, we may be confident that elected officials charged with implementing it will be quite clear to their constituents where the source of the misfortune lies. These cases demonstrate the point. Sheriffs Printz and Mack have made public statements, including their decisions to serve as plaintiffs in these actions, denouncing the Brady Act. See, *e. g.*, Shaffer, Gun Suit Shoots Sheriff into Spotlight, Arizona Republic, July 5, 1994, p. B1; Downs, Most Gun Dealers Shrug off Proposal to Raise License Fee, Missoulian, Jan. 5, 1994. Indeed, Sheriff Mack has written a book discussing his views on the issue. See R. Mack & T. Walters, From My Cold Dead Fingers: Why America Needs Guns (1994). Moreover, we can be sure that CLEO's will inform disgruntled constituents who have been denied permission to purchase a handgun about the origins of the Brady Act requirements. The Court's suggestion that voters will be confused over who is to "blame" for the statute reflects a gross lack of confidence in the electorate that is at war with the basic assumptions underlying any democratic government.

[19] Unlike the majority's judicially crafted rule, the statute excludes from its coverage bills in certain subject areas, such as emergency matters, legislation prohibiting discrimination, and national security measures. See 2 U. S. C. § 1503 (1994 ed., Supp. II).

unelected judges are better off leaving the protection of federalism to the political process in all but the most extraordinary circumstances.[20]

Perversely, the majority's rule seems more likely to damage than to preserve the safeguards against tyranny provided by the existence of vital state governments. By limiting the ability of the Federal Government to enlist state officials in the implementation of its programs, the Court creates incentives for the National Government to aggrandize itself. In the name of State's rights, the majority would have the Federal Government create vast national bureaucracies to implement its policies. This is exactly the sort of thing that the early Federalists promised would not occur, in part as a result of the National Government's ability to rely on the magistracy of the States. See, e. g., The Federalist No. 36, at 234–235 (A. Hamilton); id., No. 45, at 318 (J. Madison).[21]

With colorful hyperbole, the Court suggests that the unity in the Executive Branch of the Federal Government "would be shattered, and the power of the President would be sub-

---

[20] The initial signs are that the Act will play an important role in curbing the behavior about which the majority expresses concern. In the law's first year, the Congressional Budget Office identified only five bills containing unfunded mandates over the statutory threshold. Of these, one was not enacted into law, and three were modified to limit their effect on the States. The fifth, which was enacted, was scarcely a program of the sort described by the majority at all; it was a generally applicable increase in the minimum wage. See Congressional Budget Office, The Experience of the Congressional Budget Office During the First Year of the Unfunded Mandates Reform Act 13–15 (Jan. 1997).

[21] The Court raises the specter that the National Government seeks the authority "to impress into its service . . . the police officers of the 50 States." Ante, at 922. But it is difficult to see how state sovereignty and individual liberty are more seriously threatened by federal reliance on state police officers to fulfill this minimal request than by the aggrandizement of a national police force. The Court's alarmist hypothetical is no more persuasive than the likelihood that Congress would actually enact any such program.

ject to reduction, if Congress could . . . requir[e] state officers to execute its laws." *Ante,* at 923. Putting to one side the obvious tension between the majority's claim that impressing state police officers will unduly tip the balance of power in favor of the federal sovereign and this suggestion that it will emasculate the Presidency, the Court's reasoning contradicts *New York* v. *United States.*[22]

That decision squarely approved of cooperative federalism programs, designed at the national level but implemented principally by state governments. *New York* disapproved of a particular *method* of putting such programs into place, not the *existence* of federal programs implemented locally. See 505 U. S., at 166 ("Our cases have identified a variety of methods . . . by which Congress may urge a State to adopt a legislative program consistent with federal interests"). Indeed, nothing in the majority's holding calls into question the three mechanisms for constructing such programs that *New York* expressly approved. Congress may require the States to implement its programs as a condition of federal spending,[23] in order to avoid the threat of unilateral federal action in the area,[24] or as a part of a program that affects States and private parties alike.[25] The majority's suggestion in response to this dissent that Congress' ability to create such programs is limited, *ante,* at 923, n. 12, is belied by the importance and sweep of the federal statutes that meet this description, some of which we described in *New York.* See

---

[22] Moreover, with respect to programs that directly enlist the local government officials, the majority's position rests on nothing more than a fanciful hypothetical. The enactment of statutes that merely involve the gathering of information, or the use of state officials on an interim basis, do not raise even arguable separation-of-powers concerns.

[23] See *New York,* 505 U. S., at 167; see, *e. g., South Dakota* v. *Dole,* 483 U. S. 203 (1987); see also *ante,* at 936 (O'CONNOR, J., concurring).

[24] *New York,* 505 U. S., at 167; see, *e. g., Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264 (1981).

[25] *New York,* 505 U. S., at 160; see, *e. g., Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985).

505 U. S., at 167–168 (mentioning, *inter alia*, the Clean Water Act, the Occupational Safety and Health Act of 1970, and the Resource Conservation and Recovery Act of 1976).

Nor is there force to the assumption undergirding the Court's entire opinion that if this trivial burden on state sovereignty is permissible, the entire structure of federalism will soon collapse. These cases do not involve any mandate to state legislatures to enact new rules. When legislative action, or even administrative rulemaking, is at issue, it may be appropriate for Congress either to pre-empt the State's lawmaking power and fashion the federal rule itself, or to respect the State's power to fashion its own rules. But these cases, unlike any precedent in which the Court has held that Congress exceeded its powers, merely involve the imposition of modest duties on individual officers. The Court seems to accept the fact that Congress could require private persons, such as hospital executives or school administrators, to provide arms merchants with relevant information about a prospective purchaser's fitness to own a weapon; indeed, the Court does not disturb the conclusion that flows directly from our prior holdings that the burden on police officers would be permissible if a similar burden were also imposed on private parties with access to relevant data. See *New York*, 505 U. S., at 160; *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985). A structural problem that vanishes when the statute affects private individuals as well as public officials is not much of a structural problem.

Far more important than the concerns that the Court musters in support of its new rule is the fact that the Framers entrusted Congress with the task of creating a working structure of intergovernmental relationships around the framework that the Constitution authorized. Neither explicitly nor implicitly did the Framers issue any command that forbids Congress from imposing federal duties on private citizens or on local officials. As a general matter, Con-

gress has followed the sound policy of authorizing federal agencies and federal agents to administer federal programs. That general practice, however, does not negate the existence of power to rely on state officials in occasional situations in which such reliance is in the national interest. Rather, the occasional exceptions confirm the wisdom of Justice Holmes' reminder that "the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex.* v. *Pinson*, 282 U. S. 499, 501 (1931).

## IV

Finally, the Court advises us that the "prior jurisprudence of this Court" is the most conclusive support for its position. *Ante*, at 925. That "prior jurisprudence" is *New York* v. *United States.*[26] The case involved the validity of a federal statute that provided the States with three types of incentives to encourage them to dispose of radioactive wastes generated within their borders. The Court held that the first two sets of incentives were authorized by affirmative grants of power to Congress, and therefore "not inconsistent with the Tenth Amendment." 505 U. S., at 173, 174. That holding, of course, sheds no doubt on the validity of the Brady Act.

The third so-called "incentive" gave the States the option either of adopting regulations dictated by Congress or of taking title to and possession of the low level radioactive waste. The Court concluded that, because Congress had no power to compel the state governments to take title to the

---

[26] The majority also cites to *FERC* v. *Mississippi*, 456 U. S. 742 (1982), and *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981). See *ante*, at 925–926. Neither case addressed the issue presented here. *Hodel* simply reserved the question. See 452 U. S., at 288. The Court's subsequent opinion in *FERC* did the same, see 456 U. S., at 764–765; and, both its holding and reasoning cut against the majority's view in these cases.

waste, the "option" really amounted to a simple command to the States to enact and enforce a federal regulatory program. *Id.,* at 176. The Court explained:

"A choice between two unconstitutionally coercive regulatory techniques is no choice at all. Either way, 'the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program,' *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., supra,* at 288, an outcome that has never been understood to lie within the authority conferred upon Congress by the Constitution." *Ibid.*

After noting that the "take title provision appears to be unique" because no other federal statute had offered "a state government no option other than that of implementing legislation enacted by Congress," the Court concluded that the provision was "inconsistent with the federal structure of our Government established by the Constitution." *Id.,* at 177.

Our statements, taken in context, clearly did not decide the question presented here, whether state executive officials—as opposed to state legislators—may in appropriate circumstances be enlisted to implement federal policy. The "take title" provision at issue in *New York* was beyond Congress' authority to enact because it was "in principle . . . no different than a congressionally compelled subsidy from state governments to radioactive waste producers," *id.,* at 175, almost certainly a legislative Act.

The majority relies upon dictum in *New York* to the effect that "[t]he Federal Government may not compel the States to enact *or administer* a federal regulatory program." *Id.,* at 188 (emphasis added); see *ante,* at 933. But that language was wholly unnecessary to the decision of the case. It is, of course, beyond dispute that we are not bound by the dicta of our prior opinions. See, *e. g., U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership,* 513 U. S. 18, 24 (1994) (SCALIA, J.) ("invoking our customary refusal to be bound by dicta"). To

the extent that it has any substance at all, *New York*'s administration language may have referred to the possibility that the State might have been able to take title to and devise an elaborate scheme for the management of the radioactive waste through purely executive policymaking. But despite the majority's effort to suggest that similar activities are required by the Brady Act, see *ante*, at 927–928, it is hard to characterize the minimal requirement that CLEO's perform background checks as one involving the exercise of substantial policymaking discretion on that essentially legislative scale.[27]

Indeed, JUSTICE KENNEDY's recent comment about another case that was distinguishable from *New York* applies to these cases as well:

"This is not a case where the etiquette of federalism has been violated by a formal command from the Na-

---

[27] Indeed, this distinction is made in the *New York* opinion itself. In that case, the Court rejected the Government's argument that earlier decisions supported the proposition that "the Constitution does, in some circumstances, permit federal directives to state governments." *New York*, 505 U. S., at 178. But in doing so, it distinguished those cases on a ground that applies to the federal directive in the Brady Act:

"[A]ll involve congressional regulation of individuals, not congressional requirements that States regulate. . . .

. . . . .

"[T]he cases relied upon by the United States hold only that federal law is enforceable in state courts and that federal courts may in proper circumstances order state officials to comply with federal law, propositions that by no means imply any authority on the part of Congress to mandate state regulation." *Id.*, at 178–179.

The Brady Act contains no command directed to a sovereign State or to a state legislature. It does not require any state entity to promulgate any federal rule. In these cases, the federal statute is not even being applied to any state official. See n. 16, *supra*. It is a "congressional regulation of individuals," *New York*, 505 U. S., at 178, including gun retailers and local police officials. Those officials, like the judges referred to in the *New York* opinion, are bound by the Supremacy Clause to comply with federal law. Thus if we accept the distinction identified in the *New York* opinion itself, that decision does not control the disposition of these cases.

tional Government directing the State to enact a certain policy, cf. *New York* v. *United States,* 505 U. S. 144 (1992), or to organize its governmental functions in a certain way, cf. *FERC* v. *Mississippi,* 456 U. S., at 781, (O'CONNOR, J., concurring in judgment in part and dissenting in part)." *Lopez,* 514 U. S., at 583 (concurring opinion).

In response to this dissent, the majority asserts that the difference between a federal command addressed to individuals and one addressed to the State itself "cannot be a constitutionally significant one." *Ante,* at 930. But as I have already noted, n. 16, *supra,* there is abundant authority in our Eleventh Amendment jurisprudence recognizing a constitutional distinction between local government officials, such as the CLEO's who brought this action, and state entities that are entitled to sovereign immunity. To my knowledge, no one has previously thought that the distinction "disembowels," *ante,* at 931, the Eleventh Amendment.[28]

Importantly, the majority either misconstrues or ignores three cases that are more directly on point. In *FERC* v. *Mississippi,* 456 U. S. 742 (1982), we upheld a federal statute requiring state utilities commissions, *inter alia,* to take the affirmative step of considering federal energy standards in a manner complying with federally specified notice and comment procedures, and to report back to Congress periodically. The state commissions could avoid this obligation

---

[28] Ironically, the distinction that the Court now finds so preposterous can be traced to the majority opinion in *National League of Cities.* See 426 U. S., at 854 ("[T]he States as States stand on a quite different footing from an individual or a corporation when challenging the exercise of Congress' power to regulate commerce"). The fact that the distinction did not provide an adequate basis for curtailing the power of Congress to extend the coverage of the Fair Labor Standards Act to state employees does not speak to the question whether it may identify a legitimate difference between a directive to local officers to provide information or assistance to the Federal Government and a directive to a State to enact legislation.

only by ceasing regulation in the field, a "choice" that we recognized was realistically foreclosed, since Congress had put forward no alternative regulatory scheme to govern this very important area. *Id.*, at 764, 766, 770. The burden on state officials that we approved in *FERC* was far more extensive than the minimal, temporary imposition posed by the Brady Act.[29]

Similarly, in *Puerto Rico* v. *Branstad*, 483 U. S. 219 (1987), we overruled our earlier decision in *Kentucky* v. *Dennison*, 24 How. 66 (1861), and held that the Extradition Act of 1793 permitted the Commonwealth of Puerto Rico to seek extradition of a fugitive from its laws without constitutional barrier. The Extradition Act, as the majority properly concedes, plainly imposes duties on state executive officers. See *ante*, at 908–909. The majority suggests that this statute is nevertheless of little importance because it simply constitutes an implementation of the authority granted the National Government by the Constitution's Extradition Clause, Art. IV, §2. But in *Branstad* we noted ambiguity as to whether Puerto Rico benefits from that Clause, which applies on its face only to "States." Avoiding the question of the Clause's applicability, we held simply that under the Extradition Act Puerto Rico had the power to request that the State of Iowa deliver up the fugitive the Commonwealth sought. 483 U. S., at 229–230. Although *Branstad* relied on the authority of the Act alone, without the benefit of the

---

[29] The majority correctly notes the opinion's statement that "this Court never has sanctioned explicitly a federal command to the States to promulgate and enforce laws and regulations . . . ." *FERC*, 456 U. S., at 761–762. But the Court truncates this quotation in a grossly misleading fashion. We continued by noting *in that very sentence* that "there are instances where the Court has upheld federal statutory structures that in effect directed state decisionmakers to take or to refrain from taking certain actions." *Ibid.* Indeed, the Court expressly rejected as "rigid and isolated," *id.*, at 761, our suggestion long ago in *Kentucky* v. *Dennison*, 24 How. 66, 107 (1861), that Congress "has no power to impose on a State officer, as such, any duty whatever."

Extradition Clause, we noted no barrier to our decision in the principles of federalism—despite the fact that one Member of the Court brought the issue to our attention, see *id.*, at 231 (SCALIA, J., concurring in part and concurring in judgment).[30]

Finally, the majority provides an incomplete explanation of our decision in *Testa* v. *Katt*, 330 U. S. 386 (1947), and demeans its importance. In that case the Court unanimously held that state courts of appropriate jurisdiction must occupy themselves adjudicating claims brought by private litigants under the federal Emergency Price Control Act of 1942, regardless of how otherwise crowded their dockets might be with state-law matters. That is a much greater imposition on state sovereignty than the Court's characterization of the case as merely holding that "state courts cannot refuse to apply federal law," *ante*, at 928. That characterization describes only the narrower duty to apply federal law in cases that the state courts have consented to entertain.

---

[30] Moreover, *Branstad* unequivocally rejected an important premise that resonates throughout the majority opinion: namely, that because the States retain their sovereignty in areas that are unregulated by federal law, notions of comity rather than constitutional power govern any direction by the National Government to state executive or judicial officers. That construct was the product of the ill-starred opinion of Chief Justice Taney in *Kentucky* v. *Dennison*, 24 How. 66 (1861), announced at a time when "the practical power of the Federal Government [was] at its lowest ebb," *Branstad*, 483 U. S., at 225. As we explained:

"If it seemed clear to the Court in 1861, facing the looming shadow of a Civil War, that 'the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it,' 24 How., at 107, basic constitutional principles now point as clearly the other way." *Id.*, at 227.

"*Kentucky* v. *Dennison* is the product of another time. The conception of the relation between the States and the Federal Government there announced is fundamentally incompatible with more than a century of constitutional development. Yet this decision has stood while the world of which it was a part has passed away. We conclude that it may stand no longer." *Id.*, at 230.

968

The language drawn from the Supremacy Clause upon which the majority relies ("the Judges in every State shall be bound [by federal law], any Thing in the Constitution or Laws of any state to the Contrary notwithstanding"), expressly embraces that narrower conflict of laws principle. Art. VI, cl. 2.   But the Supremacy Clause means far more. As *Testa* held, because the "Laws of the United States . . . [are] the supreme Law of the Land," state courts of appropriate jurisdiction must hear federal claims whenever a federal statute, such as the Emergency Price Control Act, requires them to do so.   Art. VI, cl. 2.

Hence, the Court's textual argument is quite misguided. The majority focuses on the Clause's specific attention to the point that "Judges in every State shall be bound."   *Ibid.* That language commands state judges to "apply federal law" in cases that they entertain, but it is not the source of their duty to accept jurisdiction of federal claims that they would prefer to ignore.   Our opinions in *Testa*, and earlier the *Second Employers' Liability Cases*, rested generally on the language of the Supremacy Clause, without any specific focus on the reference to judges.[31]

---

[31] As the discussion above suggests, the Clause's mention of judges was almost certainly meant as nothing more than a choice-of-law rule, informing the state courts that they were to apply federal law in the event of a *conflict* with state authority.   The majority's quotation of this language, *ante*, at 928–929, is quite misleading because it omits a crucial phrase that follows the mention of state judges.   In its entirety, the Supremacy Clause reads: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, *any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.*"   Art. VI, cl. 2 (emphasis added).   The omitted language, in my view, makes clear that the specific reference to judges was designed to do nothing more than state a choice-of-law principle.   The fact that our earliest opinions in this area, see *Testa; Second Employers' Liability Cases,* written at a time when the question was far more hotly contested

The majority's reinterpretation of *Testa* also contradicts our decision in *FERC*. In addition to the holding mentioned earlier, see *supra*, at 965–966, we also approved in that case provisions of federal law requiring a state utilities commission to "adjudicate disputes arising under [a federal] statute." *FERC*, 456 U. S., at 760. Because the state commission had "jurisdiction to entertain claims analogous to those" put before it under the federal statute, *ibid.*, we held that *Testa* required it to adjudicate the federal claims. Although the commission was serving an adjudicative function, the commissioners were unquestionably not "judges" within the meaning of Art. VI, cl. 2. It is impossible to reconcile the Court's present view that *Testa* rested entirely on the specific reference to state judges in the Supremacy Clause with our extension of that early case in *FERC*.[32]

Even if the Court were correct in its suggestion that it was the reference to judges in the Supremacy Clause, rather than the central message of the entire Clause, that dictated the result in *Testa*, the Court's implied *expressio unius* argument that the Framers therefore did *not* intend to permit the enlistment of other state officials is implausible. Throughout our history judges, state as well as federal, have merited as much respect as executive agents. The notion that the Framers would have had no reluctance to "press

---

than it is today, did not rely upon that language lends considerable support to this reading.

[32] The Court's suggestion that these officials ought to be treated as "judges" for constitutional purposes because that is, functionally, what they are, is divorced from the constitutional text upon which the majority relies, which refers quite explicitly to "Judges" and not administrative officials. In addition, it directly contradicts the majority's position that early statutes requiring state courts to perform executive functions are irrelevant to our assessment of the original understanding because "Judges" were at issue. In short, the majority's adoption of a proper functional analysis gives away important ground elsewhere without shoring up its argument here.

state judges into federal service" against their will but would have regarded the imposition of a similar—indeed, far lesser— burden on town constables as an intolerable affront to principles of state sovereignty can only be considered perverse. If such a distinction had been contemplated by the learned and articulate men who fashioned the basic structure of our government, surely some of them would have said so.[33]

\* \* \*

The provision of the Brady Act that crosses the Court's newly defined constitutional threshold is more comparable to a statute requiring local police officers to report the identity of missing children to the Crime Control Center of the Department of Justice than to an offensive federal command to a sovereign State. If Congress believes that such a statute will benefit the people of the Nation, and serve the interests of cooperative federalism better than an enlarged federal bureaucracy, we should respect both its policy judgment and its appraisal of its constitutional power.

Accordingly, I respectfully dissent.

JUSTICE SOUTER, dissenting.

I join JUSTICE STEVENS's dissenting opinion, but subject to the following qualifications. While I do not find anything dispositive in the paucity of early examples of federal employment of state officers for executive purposes, for the reason given by JUSTICE STEVENS, *ante*, at 948–949, neither would I find myself in dissent with no more to go on than those few early instances in the administration of naturaliza-

---

[33] Indeed, presuming that the majority has correctly read the Supremacy Clause, it is far more likely that the founders had a special respect for the independence of judges, and so thought it particularly important to emphasize that state judges were bound to apply federal law. The Framers would hardly have felt any equivalent need to state the then well-accepted point, see *supra*, at 945–948, that the enlistment of state executive officials was entirely proper.

tion laws, for example, or such later instances as state support for federal emergency action, see *ante*, at 949–950; *ante*, at 905–910, 916–917 (majority opinion). These illustrations of state action implementing congressional statutes are consistent with the Government's positions, but they do not speak to me with much force.

In deciding these cases, which I have found closer than I had anticipated, it is The Federalist that finally determines my position. I believe that the most straightforward reading of No. 27 is authority for the Government's position here, and that this reading is both supported by No. 44 and consistent with Nos. 36 and 45.

Hamilton in No. 27 first notes that because the new Constitution would authorize the National Government to bind individuals directly through national law, it could "employ the ordinary magistracy of each [State] in the execution of its laws." The Federalist No. 27, p. 174 (J. Cooke ed. 1961) (A. Hamilton). Were he to stop here, he would not necessarily be speaking of anything beyond the possibility of cooperative arrangements by agreement. But he then addresses the combined effect of the proposed Supremacy Clause, U. S. Const., Art. VI, cl. 2, and state officers' oath requirement, U. S. Const., Art. VI, cl. 3, and he states that "the Legislatures, Courts and Magistrates of the respective members will be incorporated into the operations of the national government, *as far as its just and constitutional authority extends;* and will be rendered auxiliary to the enforcement of its laws." The Federalist No. 27, at 174–175 (emphasis in original). The natural reading of this language is not merely that the officers of the various branches of state governments may be employed in the performance of national functions; Hamilton says that the state governmental machinery "will be incorporated" into the Nation's operation, and because the "auxiliary" status of the state officials will occur because they are "bound by the sanctity of an oath," *id.*, at 175, I take him to mean that their auxiliary functions

will be the products of their obligations thus undertaken to support federal law, not of their own, or the States', unfettered choices.[1]   Madison in No. 44 supports this reading in

---

[1] The Court offers two criticisms of this analysis.   First, as the Court puts it, the consequences set forth in this passage (that is, rendering state officials "auxiliary" and "incorporat[ing]" them into the operations of the Federal Government) "are said . . . to flow *automatically* from the officers' oath," *ante*, at 912; from this, the Court infers that on my reading, state officers' obligations to execute federal law must follow "without the necessity for a congressional directive that they implement it," *ibid.*   But neither Hamilton nor I use the word "automatically"; consequently, there is no reason on Hamilton's view to infer a state officer's affirmative obligation without a textual indication to that effect.   This is just what JUSTICE STEVENS says, *ante*, at 948, and n. 8.

Second, the Court reads The Federalist No. 27 as incompatible with our decision in *New York* v. *United States*, 505 U. S. 144 (1992), and credits me with the imagination to devise a "novel principle of political science," *ante*, at 913, n. 5, "in order to bring forth disparity of outcome from parity of language," *ibid.;* in order, that is, to salvage *New York*, by concluding that Congress can tell state executive officers what to execute without at the same time having the power to tell state legislators what to legislate. But the Court is too generous.   I simply realize that "parity of language" (*i. e.*, all state officials who take the oath are "incorporated" or are "auxiliar[ies]") operates on officers of the three branches in accordance with the quite different powers of their respective branches.   The core power of an executive officer is to enforce a law in accordance with its terms; that is why a state executive "auxiliary" may be told what result to bring about.   The core power of a legislator acting within the legislature's subject-matter jurisdiction is to make a discretionary decision on what the law should be; that is why a legislator may not be legally ordered to exercise discretion a particular way without damaging the legislative power as such.   The discretionary nature of the authorized legislative Act is probably why Madison's two examples of legislative "auxiliary" obligation address the elections of the President and Senators, see *infra*, at 973 (discussing The Federalist No. 44, p. 307 (J. Cooke ed. 1961) (J. Madison)), not the passage of legislation to please Congress.

The Court reads Hamilton's description of state officers' role in carrying out federal law as nothing more than a way of describing the duty of state officials "not to obstruct the operation of federal law," with the consequence that any obstruction is invalid.   *Ante*, at 913.   But I doubt that Hamilton's English was quite as bad as all that.   Someone whose virtue

his commentary on the oath requirement. He asks why state magistrates should have to swear to support the National Constitution, when national officials will not be required to oblige themselves to support the state counterparts. His answer is that national officials "will have no agency in carrying the State Constitutions into effect. The members and officers of the State Governments, on the contrary, will have an essential agency in giving effect to the Federal Constitution." *Id.*, No. 44, at 307 (J. Madison). He then describes the state legislative "agency" as action necessary for selecting the President, see U. S. Const., Art. II, § 1, and the choice of Senators, see U. S. Const., Art. I, § 3 (repealed by Amdt. 17). The Federalist No. 44, at 307. The Supremacy Clause itself, of course, expressly refers to the state judges' obligations under federal law, and other numbers of The Federalist give examples of state executive "agency" in the enforcement of national revenue laws.[2]

---

consists of not obstructing administration of the law is not described as "incorporated into the operations" of a government or as an "auxiliary" to its law enforcement. One simply cannot escape from Hamilton by reducing his prose to inapposite figures of speech.

[2] The Court reads Madison's No. 44 as supporting its view that Hamilton meant "auxiliaries" to mean merely "nonobstructors." It defends its position in what seems like a very sensible argument, so long as one does not go beyond the terms set by the Court: if Madison really thought state executive officials could be required to enforce federal law, one would have expected him to say so, instead of giving examples of how state officials (legislative and executive, the Court points out) have roles in the election of national officials. See *ante*, at 914–915, and n. 8. One might indeed have expected that, save for one remark of Madison's, and a detail of his language, that the Court ignores. When he asked why state officers should have to take an oath to support the National Constitution, he said that "several reasons might be assigned," but that he would "content [himself] with one which is obvious & conclusive." The Federalist No. 44, at 307. The one example he gives describes how state officials will have "an essential agency in giving effect to the federal Constitution." He was not talking about executing congressional statutes; he was talking about putting the National Constitution into effect by selecting the executive and legislative members who would exercise its powers. The answer to the

Two such examples of anticipated state collection of federal revenue are instructive, each of which is put forward to counter fears of a proliferation of tax collectors. In No. 45, Hamilton says that if a State is not given (or declines to exercise) an option to supply its citizens' share of a federal tax, the "eventual collection [of the federal tax] under the immediate authority of the Union, will generally be made by the officers, and according to the rules, appointed by the several States." *Id.*, No. 45, at 313. And in No. 36, he explains that the National Government would more readily "employ the State officers as much as possible, and to attach them to

---

Court's question (and objection), then, is that Madison was expressly choosing one example of state officer agency, not purporting to exhaust the examples possible.

There is, therefore, support in Madison's No. 44 for the straightforward reading of Hamilton's No. 27 and, so, no occasion to discount the authority of Hamilton's views as expressed in The Federalist as somehow reflecting the weaker side of a split constitutional personality. *Ante*, at 915–916, n. 9. This, indeed, should not surprise us, for one of the Court's own authorities rejects the "split personality" notion of Hamilton and Madison as being at odds in The Federalist, in favor of a view of all three Federalist writers as constituting a single personality notable for its integration:

"In recent years it has been popular to describe Publius [the nominal author of The Federalist] as a 'split personality' who spoke through Madison as a federalist and an exponent of limited government, [but] through Hamilton as a nationalist and an admirer of energetic government. . . . Neither the diagnosis of tension between Hamilton and Madison nor the indictment of each man for self-contradiction strikes me as a useful or perhaps even fair-minded exercise. Publius was, on any large view—the only correct view to take of an effort so sprawling in size and concentrated in time—a remarkably 'whole personality,' and I am far more impressed by the large area of agreement between Hamilton and Madison than by the differences in emphasis that have been read *into* rather than *in* their papers. . . . The intellectual tensions of *The Federalist* and its creators are in fact an honest reflection of those built into the Constitution it expounds and the polity it celebrates." C. Rossiter, Alexander Hamilton and the Constitution 58 (1964).

While Hamilton and Madison went their separate ways in later years, see *id.*, at 78, and may have had differing personal views, the passages from The Federalist discussed here show no sign of strain.

the Union by an accumulation of their emoluments," *id.*, No. 36, at 228, than by appointing separate federal revenue collectors.

In the light of all these passages, I cannot persuade myself that the statements from No. 27 speak of anything less than the authority of the National Government, when exercising an otherwise legitimate power (the commerce power, say), to require state "auxiliaries" to take appropriate action. To be sure, it does not follow that any conceivable requirement may be imposed on any state official. I continue to agree, for example, that Congress may not require a state legislature to enact a regulatory scheme and that *New York* v. *United States*, 505 U. S. 144 (1992), was rightly decided (even though I now believe its dicta went too far toward immunizing state administration as well as state enactment of such a scheme from congressional mandate); after all, the essence of legislative power, within the limits of legislative jurisdiction, is a discretion not subject to command. But insofar as national law would require nothing from a state officer inconsistent with the power proper to his branch of tripartite state government (say, by obligating a state judge to exercise law enforcement powers), I suppose that the reach of federal law as Hamilton described it would not be exceeded, cf. *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 554, 556–567 (1985) (without precisely delineating the outer limits of Congress's Commerce Clause power, finding that the statute at issue was not "destructive of state sovereignty").

I should mention two other points. First, I recognize that my reading of The Federalist runs counter to the view of Justice Field, who stated explicitly in *United States* v. *Jones*, 109 U. S. 513, 519–520 (1883), that the early examples of state execution of federal law could not have been required against a State's will. But that statement, too, was dictum, and as against dictum even from Justice Field, Madison and Hamilton prevail. Second, I do not read any of The Federalist

material as requiring the conclusion that Congress could require administrative support without an obligation to pay fair value for it. The quotation from No. 36, for example, describes the United States as paying. If, therefore, my views were prevailing in these cases, I would remand for development and consideration of petitioners' points, that they have no budget provision for work required under the Act and are liable for unauthorized expenditures. Brief for Petitioner in No. 95–1478, pp. 4–5; Brief for Petitioner in No. 95–1503, pp. 6–7.

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

I would add to the reasons JUSTICE STEVENS sets forth the fact that the United States is not the only nation that seeks to reconcile the practical need for a central authority with the democratic virtues of more local control. At least some other countries, facing the same basic problem, have found that local control is better maintained through application of a principle that is the direct opposite of the principle the majority derives from the silence of our Constitution. The federal systems of Switzerland, Germany, and the European Union, for example, all provide that constituent states, not federal bureaucracies, will themselves implement many of the laws, rules, regulations, or decrees enacted by the central "federal" body. Lenaerts, Constitutionalism and the Many Faces of Federalism, 38 Am. J. Comp. L. 205, 237 (1990); D. Currie, The Constitution of the Federal Republic of Germany 66, 84 (1994); Mackenzie-Stuart, Foreword, Comparative Constitutional Federalism: Europe and America ix (M. Tushnet ed. 1990); Kimber, A Comparison of Environmental Federalism in the United States and the European Union, 54 Md. L. Rev. 1658, 1675–1677 (1995). They do so in part because they believe that such a system interferes less, not more, with the independent authority of the "state," member nation, or other subsidiary government, and helps

to safeguard individual liberty as well. See Council of European Communities, European Council in Edinburgh, 11–12 Dec. 1992, Conclusions of the Presidency 20–21 (1993); D. Lasok & K. Bridge, Law and Institutions of the European Union 114 (1994); Currie, *supra*, at 68, 81–84, 100–101; Frowein, Integration and the Federal Experience in Germany and Switzerland, in 1 Integration Through Law 573, 586–587 (M. Cappelletti, M. Seccombe, & J. Weiler eds. 1986); Lenaerts, *supra*, at 232, 263.

Of course, we are interpreting our own Constitution, not those of other nations, and there may be relevant political and structural differences between their systems and our own. Cf. The Federalist No. 20, pp. 134–138 (C. Rossiter ed. 1961) (J. Madison and A. Hamilton) (rejecting certain aspects of European federalism). But their experience may nonetheless cast an empirical light on the consequences of different solutions to a common legal problem—in this case the problem of reconciling central authority with the need to preserve the liberty-enhancing autonomy of a smaller constituent governmental entity. Cf. *id.*, No. 42, at 268 (J. Madison) (looking to experiences of European countries); *id.*, No. 43, at 275, 276 (J. Madison) (same). And that experience here offers empirical confirmation of the implied answer to a question JUSTICE STEVENS asks: Why, or how, would what the majority sees as a constitutional alternative—the creation of a new federal gun-law bureaucracy, or the expansion of an existing federal bureaucracy—better promote either state sovereignty or individual liberty? See *ante*, at 945, 959 (STEVENS, J., dissenting).

As comparative experience suggests, there is no need to interpret the Constitution as containing an absolute principle—forbidding the assignment of virtually any federal duty to any state official. Nor is there a need to read the Brady Act as permitting the Federal Government to overwhelm a state civil service. The statute uses the words "reasonable effort," 18 U. S. C. § 922(s)(2)—words that easily can encom-

pass the considerations of, say, time or cost necessary to avoid any such result.

Regardless, as JUSTICE STEVENS points out, the Constitution itself is silent on the matter. *Ante,* at 944, 954, 961 (dissenting opinion). Precedent supports the Government's position here. *Ante,* at 956, 960–961, 962–970 (STEVENS, J., dissenting). And the fact that there is not more precedent—that direct federal assignment of duties to state officers is not common—likely reflects, not a widely shared belief that any such assignment is incompatible with basic principles of federalism, but rather a widely shared practice of assigning such duties in other ways. See, *e. g., South Dakota* v. *Dole,* 483 U. S. 203 (1987) (spending power); *Garcia* v. *United States,* 469 U. S. 70 (1984); *New York* v. *United States,* 505 U. S. 144, 160 (1992) (general statutory duty); *FERC* v. *Mississippi,* 456 U. S. 742 (1982) (pre-emption). See also *ante,* at 973–974 (SOUTER, J., dissenting). Thus, there is neither need nor reason to find in the Constitution an absolute principle, the inflexibility of which poses a surprising and technical obstacle to the enactment of a law that Congress believed necessary to solve an important national problem.

For these reasons and those set forth in JUSTICE STEVENS' opinion, I join his dissent.